**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **OIL PATCH GROUP, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.**   4:23-cv-2268 |
| | § | |
| **DEREK ELZNER,** | § | |
| **DWAYNE "BUBBA" BERAN,** | § | |
| **TITAN ACCOMMODATIONS, LLC** | § | |
| | § | |
| **Defendants.** | § | |

## ORIGINAL COMPLAINT

Plaintiff Oil Patch Group, Inc. (**"Plaintiff"** or **"OPG"**) files this Original Complaint (**"Complaint"**) against Defendants Derek Elzner (**"Elzner"**), Dwayne "Bubba" Beran (**"Beran"**) (Elzner and Beran collectively **"Employee Defendants"**), and Titan Accommodations, LLC (**"Titan"**) (Employee Defendants and Titan collectively (**"Defendants"**), and alleges as follows:

## INTRODUCTION

1.     OPG has spent significant time and resources in becoming a leader in the oilfield housing, rental, and services industry. OPG has also expended significant time and resources in developing relationships and goodwill with its customers and employees. Now, using OPG's trade secrets and confidential information, two former high-ranking OPG employees have launched a surprise and orchestrated campaign to start a competing business and raid OPG's customers and employees. And they are doing so in blatant violation of their restrictive covenants with OPG as well as other contractual and legal obligations.

2.     This campaign, though long and devious, is quite simple. In 2017, right before OPG was acquired by a new parent company, Defendant Elzner, OPG's President, used his position to

**ORIGINAL COMPLAINT**                                                                                   **Page 1**

attempt to "terminate" his *own* employment agreement with OPG as well as the employment agreements of certain other employees, including Defendant Beran, Elzner's lieutenant. The employment agreements contain post-employment non-compete and non-solicit restrictive covenants. Elzner did this behind the back and without approval of OPG's Board of Directors. There was no reason for Elzner to "terminate" employment agreements, including his *own* agreement, particularly because they continued to remain employed by OPG. The most obvious explanation is either that Elzner desired to keep his options open or already had a tangible plan to compete against OPG—something that has now come to fruition.

3.      Earlier this year, while Elzner was still employed as the President of OPG, he secretly started a new company, Defendant Titan, and is registered as its managing member. A few weeks later, Elzner abruptly resigned from OPG, without any warning or notice. Elzner's resignation was followed, starting two days later, by Beran and seven other OPG employees. Elzner, Beran, and the other departing employees then launched into full-fledged competition against OPG through Titan in the oilfield housing, rental, and services industry. Within days of the coordinated departure, two of OPG's biggest customers—accounting for millions in annual revenue for OPG—informed OPG they were moving business from OPG to Titan.

4.      In May of 2023, OPG sent letters to Employee Defendants and other employees, imploring them to adhere to their contractual and/or other legal obligations, including restrictive covenants and non-disclosure obligations. Thumbing their nose at OPG's letters, Employee Defendants responded through their attorneys, revealing to OPG that Elzner had surreptitiously and without authorization signed letters purporting to "terminate" Employee Defendants' employment agreements containing the restrictive covenants. Employee Defendants also denied possessing or using confidential information. In response, OPG's attorney explained Employee

Defendants' restrictive covenants survived the attempted termination of the employment agreements, demanded the return of confidential information, and demanded that Employee Defendants cease and desist from their unlawful conduct.

5.       But Defendants got sloppy. Despite the representations they did not possess and were not using OPG's confidential information, on June 1, 2023, a former employee of OPG, and also wife of Defendant Beran who left OPG to go work for Titan, emailed a Titan expense report to Defendant Beran's old OPG email address. Alarmingly, the Titan expense report was nearly an exact replica of OPG's confidential and trade secret expense reports. The only difference was the name at the top was changed from OPG to Titan. In fact, the Titan expense report still had a reference to "OPG" in the small print in the expense report.

6.       The stolen OPG expense reports help explain how Defendants were able to so quickly mobilize and become a direct competitor diverting business from OPG's largest customers. Defendants had given themselves a head start by leveraging OPG's confidential and trade secret information—which OPG spent years and valuable resources developing—to launch a fully-capable company positioned to immediately begin unlawfully competing against OPG and raiding OPG's customers and employees.

7.       Defendants' unlawful conduct is causing immediate and irreparable harm to OPG. OPG filed this action to prevent further irreparable harm through a temporary restraining order and preliminary and permanent injunctive relief, along with other relief.

## **THE PARTIES**

8.       Plaintiff Oil Patch Group, Inc. is a Delaware corporation with its headquarters and principal place of business at 12012 Wickchester Ln, Suite 475, Houston, Texas 77079.

9.     Defendant Derek Elzner is the former President of OPG. His last known address is 856 County Road 343, Gause, Texas 77857.

10.     Defendant Dwayne "Bubba" Beran is a former Director – Southwest Accommodations of OPG. His last known address is 501 Coliseum Court, Midland, Texas 79706.

11.     Defendant Titan Accommodations, LLC is a Texas Limited Liability Company with its principal place of business at 856 County Road 343, Gause, Texas 77857. Titan's sole member is Derek Elzner who is a Texas resident with a last known address of 856 County Road 343, Gause, Texas 77857.

## JURISDICTION AND VENUE

12.     This Court has personal jurisdiction over Employee Defendants as they live in Texas and worked in this district and expressly consented to jurisdiction of the federal courts sitting in Harris County in the Employment Agreement of Elzner and Beran. Ex. A, B § 9.2. This Court has personal jurisdiction over Titan as it is a Texas Limited Liability Company with its principal place of business in Texas.

13.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1367. OPG asserts causes of action under the Defend Trade Secrets Act (**"DTSA"**), 18 U.S.C. § 1836(b), and the Computer Fraud and Abuse Act (**"CFAA"**), 18 U.S.C. § 1030(g). This Court has subject matter jurisdiction over these federal claims pursuant to 18 U.S.C. § 1331. This Court has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367 because the state law claims against Defendants are so related to the DTSA and CFAA claims that they form part of the same case or controversy. *See*, *e.g., Am. Mortgage & Equity Consultants, Inc. v. Bowersock*, 1:19-CV-432-RP, 2019 WL 2250170, at *1 (W.D. Tex. May 24, 2019) (addressing DTSA and CFAA claims along with state law claims for breach of a non-solicitation

agreement, tortious interference with a contract, civil conspiracy, conversion, and restitution); *BRG Ins. Sols., LLC v. O'Connell*, 3:16-CV-2448-N, 2017 WL 7513649, at *1 (N.D. Tex. July 18, 2017) (addressing a DTSA claim along with state law claims for tortious interference with prospective business relationships, tortious interference with business relationships, breach of non-compete and non-solicitation agreements, and civil conspiracy).

14.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District and a substantial part of the property that is the subject of the action is situated in this District. 28 U.S.C. §1391(b)(2). Venue is also proper in this District because the Employee Defendants expressly consented to federal courts sitting in Harris County as venue in the Employment Agreements of Elzner and Beran. Ex. A, B § 9.2.

## FACTUAL ALLEGATIONS

### *OPG's Business and Confidential Information*

15.     OPG is an oilfield housing, rental, services, and products company that serves customers in the oil and gas industry throughout North America. OPG provides customers with rentals of drill pipe, tubing, and tools used for drilling, completion, and workover operations in the oilfield. OPG also provides customers with rentals of short- and long-term housing quarters to support oil and gas drilling operations. In addition to its rental business, OPG provides customers with completion, production, and pressure control services to support operators and other customers in the field.

16.     OPG's (and its affiliates') confidential and trade secret information includes, without limitation, (i) business information and materials, including, without limitation, pricing models; market and business analyses; investments or investment opportunities; growth plans;

acquisition prospects; strategy; finances; business plans, methods and processes; business proposals, operations, products or services; evaluations; contract terms and conditions; pricing and bidding methodologies and data; sales data; customer information; supplier and vendor information; credit information; financial data; purchasing, pricing, bidding, selling and marketing data and contracts; (ii) technical information and materials, including, without limitation, computer programs; software; databases; methods; know-how; formulae; compositions; technological data; technological prototypes, processes, discoveries, inventions, ideas, concepts, surveys, improvements and designs; developmental or experimental work; training programs and procedures; diagrams, charts, products and services (including, without limitation, product developments, product specifications and technical specifications); (iii) information and materials relating to future plans including, but not limited to: marketing strategies and techniques; intellectual property; projects and proposals; acquisition and financing plans; strategic alliances; production processes; and research and development efforts; and (iv) any other information that gives OPG or its affiliates an advantage with respect to its competitors by virtue of not being known by those competitors (collectively **"Confidential Information"**).

17. OPG's Confidential Information is not generally known to the public, or to other companies or individuals (in OPG's industry or elsewhere) who could obtain an advantage from it, nor is it shared with third parties absent a nondisclosure agreement.

18. OPG's Confidential Information provides OPG with a significant advantage over its competitors who do not know or use the Confidential Information and who, if armed with such information, could unfairly compete with OPG in the market. Disclosure of OPG's Confidential Information to its competitors would permit them to rapidly develop identical, competing business models, products, and services to bring them to market or win valuable customer business.

19.     Furthermore, without having to incur OPG's significant research and development costs or expend the valuable labor and substantial time OPG has invested into its business, a competitor could undercut OPG's prices and engage in a price war with customers. Accordingly, the protection of the Confidential Information is paramount to the continued success of OPG's ability to fairly compete in the oilfield services, housing, rental, and products industry.

20.     In recognition of the critical need to protect its Confidential Information (particularly from a head-to-head competitor), OPG takes numerous steps to safeguard the secrecy of, and limit access to, such information. For example, among other things, OPG:

a.     requires employees like Employee Defendants to sign employee and/or restrictive covenant agreements containing nondisclosure, noncompetition, and other restrictive covenants;

b.     has policies that are designed to identify and protect its Confidential Information;

c.     requires its employees to use passwords to protect OPG's systems containing Confidential Information (including, for example, multiple layers of passwords and multifactor authentication) and prohibits the sharing of passwords;

d.     limits access to Confidential Information to those employees who need to know the information in order to perform their roles for OPG;

e.     terminates employees' access to OPG's systems when employees are terminated or resign;

f.     requires third parties to sign confidentiality agreements prior to OPG's disclosure of Confidential Information to them;

g.     trains employees on the importance of protecting OPG's Confidential Information; and

h.     has implemented technological and other physical barriers, including, for example, restricting access to its buildings and offices, and other mechanisms that prevent unauthorized access to, and transfers of, its Confidential Information.

***Employee Defendants' Employment with OPG***

21.     Elzner began working for OPG as an Operations Manager.  OPG promoted Elzner to President of OPG in 2016. The promotion to President that Elzner received from OPG during his time with OPG is a testament to the commitment and investment OPG had made in Elzner. In the role of President, which is the role Elzner held at the time of his resignation from OPG, Elzner oversaw all OPG operations and customer relationships.

22.     Beran's job title was Director – Southwest Accommodations at OPG and he was one of OPG's first employees. In his role as Director – Southwest Accommodations, Beran oversaw the Southwest region of OPG, which included Texas operations, and his job was to oversee customers and manage operations. Beran was integral to establishing OPG's business and played a substantial role in all aspects of OPG's business.

23.     So that they could perform their work for OPG, OPG gave Employee Defendants extensive access to OPG's Confidential Information, notably, including without limitation information about OPG's business and business model; supplier and pricing information; and customer information. In their roles, Employee Defendants were also involved in discussions concerning OPG's highly sensitive commercial business strategies.

24.     OPG also funded Employee Defendants' business development efforts for OPG that led to the continued development and fostering of Employee Defendants' relationships with OPG's customers.

25.     Employee Defendants were part of the client-facing aspects of OPG with significant and deep customer relationships built on behalf of OPG and using OPG's resources. Therefore, at the time Employee Defendants resigned from OPG, they were extremely well-positioned to unfairly divert OPG's customers using its Confidential Information and goodwill.

***Employee Defendants' Nondisclosure and Noncompetition Obligations to OPG***

26.     In 2013, SCF-VIII, L.P., a private equity fund managed by SCF Partners, acquired a majority stake in OPG, and as part of the transaction Elzner received cash and stock in OPG.  In conjunction with that transaction, on November 14, 2013, and in exchange for receipt of stock options, new Confidential Information, and other consideration, Employee Defendants entered into employment agreements in which they each expressly agreed, among other things, that during employment and for a period of one year following the termination of employment:

> other than on behalf of the Company or any of its Affiliates, he will refrain from carrying on or engaging directly or indirectly in the Business in the Restricted Area. Employee further agrees and covenants that, because the following conduct would effectively constitute carrying on or engaging in the Business, he will not, and he will cause his Affiliates not to, in the Restricted Area during the Prohibited Period, other than on behalf of the Company or its Affiliates, directly or indirectly, (A) own, manage, operate, join, become an employee of, control or participate in any business or Person which engages in the Business or (B) loan money to or sell or lease equipment to any business or Person which engages in the Business.

Ex. A, B § 7.2(a).[1]

---

[1] Defendant Elzner's employment agreement is referred to herein as the "**Elzner Employment Agreement**" (Ex. A) and Defendant Beran's employment agreement is referred to herein as the "**Beran Employment Agreement**" (Ex. B). They are referred to herein as the "**Employment Agreements**" collectively.

ORIGINAL COMPLAINT

27.     In recognition of their direct relationship with OPG's customers and the substantial resources and time OPG expended developing and fostering good will with those customers, Employee Defendants each further agreed that:

> he will not, and he will cause his Affiliates not to, canvass, solicit, approach or entice away, or cause to be canvassed, solicited, approached or enticed away, any customer, consultant or supplier of the Company or its Affiliates that was a customer, consultant or supplier of the Company or its Affiliates in the Restricted Area during the period during which Employee is employed by the Company or any of its Affiliates.

Ex. A, B § 7.2(c).

28.     And, in light of their supervisory and influential positions within OPG, and in recognition of the time and resources OPG expended building goodwill, training, and developing its employees, Employee Defendants each further agreed that:

> he will not, and he will cause his Affiliates not to, engage or employ, or solicit or contact with a view to the engagement or employment of, any Person who is an officer, director, employee or agent of the Company or its Affiliates.

Exhibit A, B § 7.2(d).

29.     Given that Employee Defendants' roles at OPG had influence across North America, the non-compete and non-solicit restrictions in the Employment Agreements define the "Restricted Area" as follows:

> 1. The State of Arkansas
> 2. The State of New Mexico
> 3. The State of Oklahoma
> 4. The State of Ohio
> 5. The State of Pennsylvania
> 6. The State of Texas
> 7. The State of Wyoming
> 8. Any other geographic area that is within a 50-mile radius of any location where the Company or its Affiliates or, if applicable, its successors or assigns, engages in the Business, and for which Employee has material responsibilities or about which Employee has Confidential Information, during the period that Employee is employed hereunder, including, but not limited to, any territory within the State of North Dakota.

Ex. A, B, Exhibit A.

30.     Employee Defendants also expressly acknowledged and agreed that "the limitations as to time, geographical area and scope of activity to be restrained [by the restrictive covenants] are reasonable and do not impose any greater restraint than is necessary to protect the legitimate business interests of [OPG]." Ex. A, B § 7.3. Employee Defendants further expressly acknowledged and agreed that:

> money damages would not be sufficient remedy for any breach of this Article VII by Employee, and the Company and its Affiliates shall be entitled to enforce the provisions of this Article VII by terminating payments then owing to Employee under this Agreement or otherwise and obtaining specific performance and injunctive relief as remedies for such breach or any threatened breach. Such remedies shall not be deemed the exclusive remedies for a breach of this Article VII but shall be in addition to all remedies available at law or in equity, including, without limitation, the recovery of damages from Employee and Employee's agents.

Ex. A, B § 7.3. Employee Defendants further agreed to reformation of the restrictive covenants in the Employment Agreements in the event that a court of competent jurisdiction determines them unreasonable in scope. Ex. A, B § 7.5.

31.     In addition to the restrictive covenants in the Employment Agreements, and in addition to their legal requirements under state and federal law, Employee Defendants contractually agreed to robust confidentiality and non-disclosure obligations to OPG:

> Employee agrees to preserve and protect the confidentiality of all Confidential Information. Employee agrees that Employee will not, at any time during or after Employee's employment with the Company, make any unauthorized disclosure of, and Employee shall not remove from the Company premises or other authorized premises, Confidential Information or Work Product of the Company, or make any use thereof, except, in each case, in the carrying out of Employee's responsibilities hereunder. Consistent with the above promises, Employee expressly acknowledges and agrees that Employee will not place himself in a position to make unauthorized use or disclosure (whether actually or inevitably) of the Company's Confidential Information. Employee shall use all reasonable efforts to cause all Persons to whom any Confidential Information shall be disclosed by Employee hereunder to preserve and protect the confidentiality of such Confidential information.

Ex. A, B § 5.3.

32.     Employee Defendants also agreed that:

Upon termination of Employee's employment with the Company, Employee shall promptly deliver to the Company all documents, materials (including electronically stored information) and other tangible items constituting, containing or derived from Confidential Information in Employee's possession, custody or control. In addition, at the request of the Company at any time, Employee agrees to deliver to the Company all Confidential Information that Employee may possess or control. Employee agrees that all Confidential Information of the Company (whether now or hereafter existing) conceived, discovered or made by Employee during the period of Employee's employment by the Company exclusively belongs to the Company (and not to Employee), and upon request by the Company for specified Confidential information, Employee will promptly disclose such Confidential Information to the Company and perform all actions reasonably requested by the Company to establish and confirm such exclusive ownership. Affiliates of the Company shall be third-party beneficiaries of Employee's obligations under this Article V.

Ex. A, B § 5.3.

33.     In short, in exchange for good and valuable consideration, due to the level of responsibilities and access Employee Defendants enjoyed in their roles with OPG and the protection of OPG's legitimate business interests, they were contractually bound to protect OPG's trade secrets and other confidential information during and after their employment.

***Elzner Surreptitiously Attempted to "Terminate" Employment Agreements***

34.     In late 2017, SCF Partners and OPG began working on a corporate transaction by which, Centurion Group, a global leader in, among other things, oilfield services and rental, would become the parent company of OPG and several other portfolio companies of SCF Partners.

35.     Meanwhile, unbeknownst to the full Board of OPG,[2] in the months leading up to the close of the transaction, Elzner sent letters to a number of key employees of OPG, purporting

---

[2] Derek Elzner's father, Jim Elzner (who was a Board member at that time) appears to have signed Elzner's purported "termination" letter.  His father therefore presumably knew about the improper self-interested attempted termination of his son's Employment Agreement.

to "terminate" the employment agreements, for no reason other than what appears to be an effort to keep his options open at best or, at worst, lay the groundwork for a plan to launch a competing business against OPG. Elzner also signed and sent those letters to ***himself*** and Defendant Beran, purporting to "terminate" the Employment Agreements. Further, Elzner improperly used OPG's funds and other resources to prepare those "termination" letters.

36.     While the letters stated: "It is not our desire to terminate your employment but it is our desire to terminate the Employment Agreement." Ex. E, F. The letters also stated that: "We simply wish to renegotiate the terms set out in the Employment Agreement, which is the reason we are terminating the Employment Agreement, but not your employment." *Id.* Of course, no new employment agreements were ever renegotiated or signed with those employees because OPG was not aware that they had even been terminated. That is, until, as discussed below, OPG sent a letter to Employee Defendants and other employees reminding them of their continuing employment obligations and learning through a response letter from Employee Defendants' attorneys that Elzner had attempted to terminate the Employment Agreements.

37.     Nonetheless, the Employment Agreements contained a survival clause under which certain provisions of the Employment Agreement, including restrictive covenant and confidentiality provisions, would survive termination of the Employment Agreements:

> This Section 9.10 and the provisions of Articles V, VI, VII and VIII and those portions of this Agreement necessary to interpret and apply them shall survive any termination of this Agreement and any termination of the employment relationship between Employee and the Company.

Ex. A, B § 9.10.

38.     And, critically, the one-year restricted period did not begin on termination of the Employment Agreement; instead, it began on the date Employee Defendants' employment with

OPG terminated. Ex. A, B § 1.6. Again, as Elzner's "termination" letters made clear: employment with OPG did not terminate by those letters. Ex. C, D.

### Elzner Formed Titan Accommodations, LLC to Compete Against OPG, and Employee Defendants Resign from OPG and Raid OPG's Customers and Employees

39.     On February 6, 2023, months before resigning as President of OPG, Elzner formed the business entity Titan Accommodations, LLC. Elzner is named as the managing member of Titan. Titan is a direct competitor to OPG, including through its provisions of rental housing units in the oilfield as well as oilfield services.

40.     Elzner abruptly resigned from OPG without notice on April 19, 2023. Beran resigned without notice two days later on April 21, 2023. Seven other OPG employees, including Lenae Beran, Danette Mares, Eric Elzner, Kent Kaddatz, Corey Vance, Shawn Lustig, and Justin Guillory, also resigned beginning on or about April 21, 2023. Employee Defendants, along with those other employees who collectively resigned, went to work for competitor Titan, the company formed by Elzner while still the President of OPG.

41.     Employee Defendants, along with other departing OPG employees, deleted a large number of emails from their OPG email accounts around the time of Employee Defendants' resignations from OPG.

42.     Upon information and belief, Employee Defendants work in the same or substantially similar roles at Titan as their roles at OPG.

43.     Employee Defendants have also induced two of OPG's largest customers, representing millions of dollars of annual revenue for OPG, to divert business from OPG to Titan.

44.     In short, within no time at all, Employee Defendants have Titan, a new direct competitor to OPG, up and running and have already induced OPG's employees and customers to leave OPG and go to Titan.  Their intimate knowledge of OPG's business and Confidential

Information and improper use of its Confidential Information and trade secrets gave them and Titan an unfair advantage and facilitated their ability to get Titan up and running so quickly.

***OPG Reiterated Employee Defendants' Post-Employment Obligations to OPG and Demanded Return of Confidential Information***

45.     Soon after Employee Defendants abruptly resigned to run and work for Titan, a direct competitor to OPG, taking OPG's customers and employees with them, OPG sent Employee Defendants letter to remind them of their continuing contractual and legal obligations to OPG. Ex. C, D. In OPG's letters to Employee Defendants, OPG, among other things, reminded Employee Defendants of their restrictive covenants and confidentiality obligations under the Employment Agreements. *Id.* Consistent with the Employment Agreements, OPG also demanded the immediate return of Confidential Information:

> If you possess any of OPG's trade secrets or Confidential Information, we demand that you immediately return this information to OPG, and that any remaining digital or electronic copies of this information be deleted from any storage device using reliable methods. If you need assistance in removing any electronically stored information, please contact us for assistance and we will assist you (at OPG's expense) in deleting this information.

Ex. C, D.

46.     OPG demanded a written response from Employee Defendants confirming that Employee Defendants "have returned all Company property and Confidential Information and [Employee Defendants] intend to comply fully with [Employee Defendants'] post employment obligations to the Company." Ex. C, D. OPG also demanded that Employee Defendants report any violations of their obligations so that OPG could take steps to mitigate already caused harm and future harm. *Id.*

***Employee Defendants Respond by Stating the Restrictive Covenants Were Terminated, Attaching Elzner's "Termination" Letters, and Stating They Do Not Have Confidential Information***

47.     Employee Defendants' counsel responded to OPG's letters on May 15, 2023, reassuring OPG that Employee Defendants were "ethical" and operate "in good faith and within the bounds of the law." Exhibit E, F. Employee Defendants' counsel claimed Employee Defendants do not have any Confidential Information of "Centurion." *Id.* Employee Defendants' counsel attached Elzner's "termination" letters from 2017 and somehow concluded in her response the Employment Agreements were terminated and that the restrictive covenants were no longer effective. *Id.*

48.     Defense counsel's response letters made OPG aware that Elzner had sent those signed employment agreement "termination" letters to employees behind the back of the OPG Board, raising internal alarm bells at OPG and triggering further investigation by OPG into the actions of Defendants and others.

***OPG's Undersigned Counsel Responded and Demanded that Defendants Cease and Desist Violating Statutory and Contractual Obligations to OPG***

49.     OPG's attorneys sent a letters in reply to Employee Defendants' counsel on May 19, 2023, reiterating that Employee Defendants' restrictive covenants were still effective. Ex. G, H. By those letters, OPG denied that the actions by Elzner purporting to "terminate" his own and Beran's Employment Agreements were effective and explained that, even if it was an effective termination of the Employment Agreements, the restrictive covenants and other contractual obligations survived a termination of the Employment Agreements. *Id.* And OPG reemphasized that Employee Defendants needed to return all confidential, proprietary, and trade secret information of OPG and asked for clarification regarding Employee Defendants' fulfillment of those obligations. *Id.*

50.     Through those letters, OPG explained that Employee Defendants' actions were causing irreparable harm to OPG as employees were suddenly departing OPG to join Titan and that two of OPG's customers had notified OPG that they were moving their business to Titan. Indeed, OPG demanded that Employee Defendants cease and desist from their violations of the law and contract:

> To stop further harm from occurring, [Employee Defendants] must immediately **CEASE AND DESIST** from violating [their] contractual and statutory post-employment obligations to OPG. Although OPG is still evaluating the totality of its options, I can assure you that if OPG decides to take legal action, it would not _only_ pursue breach of contract claims. And Messrs. Elzner and Beran may not be the _only_ defendants.

Ex. G; Ex. H.

51.     In the interest of trying to resolve this matter without the need to file a lawsuit and tax the resources of the judicial system, OPG gave Employee Defendants a deadline of May 26, 2023 to respond and reach a resolution.

### *Employee Defendants Engaged in More Trickery Through Their Attorneys*

52.     When May 26, 2023 came, however, Employee Defendants engaged in more deceit, this time through their attorneys. At 3:06pm on Friday, May 26, 2023, Employee Defendants' counsel responded by email, stating that she was "working to get in touch" with her clients. Employee Defendants' counsel claimed she did not yet have a formal response to OPG's proposal, and because it was the last week of school for her "kiddos," she indicated that she needed OPG to extend the May 26 deadline for response to the next week. OPG obliged, and extended the deadline to the following Wednesday, May 31, 2023.

53.     Later that evening, Defendants then filed a lawsuit against OPG in state court in Milam County, Texas—***mere hours*** after OPG granted Employee Defendants an extension to

respond to OPG's meeting proposal the following week in an effort to resolve the dispute.[3] Of course, Defendants did not inform OPG or OPG's counsel that they had filed suit until after the extended May 31 deadline had come and gone, and only informed OPG's counsel of the lawsuit after multiple follow ups by OPG's counsel after the May 31 extended deadline had come and gone.

54.     This gamesmanship caused OPG to lose valuable time, while Defendants' unlawful competition continued. OPG had to re-strategize its approach to legal action in light of the separate lawsuit Defendants rushed to file against OPG in Milam County.

***A Titan Employee Sent OPG Evidence of Defendants' Theft of Trade Secrets and Confidential Information***

55.     On June 1, 2023, after Defendants had disclaimed they were in possession of Confidential Information, one of the Titan employees—former OPG employee and Defendant Beran's wife, Lenae Beran—emailed a Titan expense report to Defendant Beran's prior OPG email address as well as to a Titan email address.

56.     Besides changing the name of the company on the top of the expense reports from OPG to Titan, they are an ***exact copy*** of OPG's trade secret and confidential expense reports that OPG uses in its business. At the very least, Defendants failed to completely scrub the stolen expense report of all traces of OPG, they sloppily left a reference to "OPG" on the face of the document in the bottom right corner of the stolen expense report.

57.     As evidenced by the stolen expense reports, the explanation for how Defendants were able to so quickly mobilize and take customers and employees from OPG is crystal clear. Defendants are diverting OPG's business to themselves by using OPG's confidential, trade secret,

---

[3] OPG will be filing motions to abate and/or transfer the proceeding in Milam County, Texas on multiple grounds, including that it was filed in the wrong venue under the law and contractual forum selection clause.

and proprietary information to directly compete against OPG in violation of Defendants'
Employment Agreements and the law.

***OPG Is Suffering Immediate and Irreparable Harm***

58.     OPG is suffering immediate and irreparable harm because of Employee
Defendants' continued employment for Titan and continued competition against OPG.

59.     Due to Employee Defendants' extensive and repeated exposure to OPG's trade
secrets and Confidential Information, and given their leadership and client-facing roles at OPG
and now direct competitor Titan, Employee Defendants' use and/or disclosure of OPG's trade
secrets, Confidential Information, and customer goodwill in the course of their work at Titan would
be unavoidable and inevitable, thereby irreparably harming OPG. Indeed, as discussed above, there
is already concrete evidence that Employee Defendants and Titan are using OPG's confidential
information to compete against OPG. OPG has no adequate or other remedy at law for such acts
and threatened acts.

60.     Given Defendants' refusal to comply with their contractual, common law, and/or
statutory obligations, OPG commenced this action to protect its trade secrets, Confidential
Information, customer goodwill, and other legitimate business interests from irreparable and
ongoing harm by Defendants.

## CAUSES OF ACTION

### Count One: Breach of Contract (Against Defendant Elzner)

61.     OPG repeats and re-alleges the foregoing allegations as if fully set forth herein.

62.     On November 14, 2023, OPG and Elzner entered into a valid and enforceable
contract—the Elzner Employment Agreement—whereby Elzner agreed, *inter alia*, that during the
duration of his employment by OPG and for a period of one (1) year following the termination of

his employment with OPG that he would refrain from, carrying on or engaging directly or indirectly, including by owning, managing, operating, joining, becoming an employee of, controlling, or participating in, a business that does "Business" in the "Restricted Area." Ex. A § 7.2.

63.     Elzner further agreed in the Elzner Employment Agreement to not solicit customers, consultants, or suppliers of OPG or its Affiliates in the "Restricted Area" for a period of one (1) year following the termination of his employment by OPG. Ex. A § 7.2.

64.     Elzner further agreed in the Elzner Employment Agreement to not solicit employees, officers, directors, employees, or agents of OPG or its Affiliates for a period of one (1) year following the termination of his employment by OPG. Ex. A § 7.2.

65.     The Elzner Employment Agreement defined "Business" as including "the provision and sale of the products and services that were provided by [OPG] or any of its Affiliates during the period of time in which [Elzner] was employed by [OPG] or its Affiliates or permitted assigns, excluding the provision of and sale of products and services as part of any business, product or service line, or division in which [Elzner] was not directly involved as a manager or supervisor during such employment." Ex. A § 7.1. "Business" is further defined as including, without limitation, "the provision of rental services related to short and long-term living quarters supporting oil and gas drilling and production operations, drill pipe rental and related drilling tool and accessory rental services, water and sewer services supporting delivery and removal of potable and non-potable water for oil and gas rigs and living quarters, and providing equipment and personnel to manage initial flowback and testing of oil and gas wells." Ex. A § 7.1.

66.     The Elzner Employment Agreement defined the "Restricted Area" as including Arkansas, New Mexico, Oklahoma, Ohio, Pennsylvania, Texas, Wyoming, and "[a]ny other

geographic area that is within a 50-mile radius of any location where [OPG] or its Affiliates or, if applicable, its successors or assigns, engages in the Business, and for which [Elzner] has material responsibilities or about which [Elzner] has Confidential Information, during the period that [OPG] is employed hereunder, including, but not limited to, any territory within the State of North Dakota." Ex. A § 7.1.

67.     Elzner further agreed in the Elzner Employment Agreement to nondisclosure obligations regarding OPG and its Affiliate's Confidential Information. Ex. A § 5.3.

68.     Elzner further agreed that he owed a fiduciary duty of loyalty to OPG. Ex. B § 2.5. And he agreed to provide advanced notice to OPG before resigning. Ex. A § 3.3.

69.     The Elzner Employment Agreement is governed by Texas law. Ex. A, § 9.2.

70.     The restrictive covenants in the Elzner Employment Agreement are ancillary to an enforceable agreement in that Elzner was provided with increased access to OPG's Confidential Information, new Confidential Information, including regarding SCF Partners, and stock options upon his signing of the Elzner Employment Agreement.

71.     The restrictive covenants in the Elzner Employment Agreement are enforceable because they are reasonable, including in time, geographical area, and the scope of the activity restrained.

72.     Elzner breached the Elzner Employment Agreement by starting and being employed by Titan—a business that is directly competitive with OPG—while still employed as the President of OPG and after.

73.     Elzner breached the Elzner Employment Agreement by suddenly resigning without any advanced warning or notice in an obvious attempt to inflict harm on OPG's business.

74.     Elzner breached the Elzner Employee Agreement by engaging in competitive employment with Titan, which jeopardizes OPG's trade secrets and Confidential Information. In addition to the trade secrets and Confidential Information already disclosed, OPG has reason to believe that Elzner will inevitably and imminently use and/or disclose OPG's trade secrets and Confidential Information in violation of the Elzner Employee Agreement.

75.     Elzner breached the Elzner Employment Agreement by soliciting OPG's employees to leave employment with OPG to become employed by Titan.

76.     Elzner breached the Elzner Employment Agreement by soliciting OPG's customers to divert business from OPG to Titan.

77.     Elzner breached the Elzner Employment Agreement by disclosing and using OPG's Confidential Information.

78.     OPG has performed all of its obligations under the Elzner Employment Agreement.

79.     As a direct and proximate cause of Elzner's breaches of the Elzner Employment Agreement, OPG has incurred damages. Accordingly, OPG is entitled to judgment against Elzner for compensatory damages, reasonable and necessary attorneys' fees under Texas Civil Practice and Remedies Code § 38.001 and the Elzner Employment Agreement, and such other and further relief to which OPG is entitled at law or in equity.

80.     Additionally, unless enjoined by this Court, Elzner's ongoing breaches of the Elzner Employment Agreement will cause irreparable harm to OPG, and OPG has no adequate or other remedy at law for such acts and threatened acts. OPG is entitled to injunctive relief to prevent Elzner from continuing to use OPG's trade secret information and from continuing to work for Titan during the period set forth in the Elzner Employment Agreement.

### Count Two: Breach of Contract (Against Defendant Beran)

81.     OPG repeats and re-alleges the foregoing allegations as if fully set forth herein.

82.     On November 14, 2023, OPG and Beran entered into a valid and enforceable contract—the Beran Employment Agreement—whereby Beran agreed, *inter alia*, that during the duration of his employment by OPG and for a period of one (1) year following the termination of his employment with OPG that he would refrain from, carrying on or engaging directly or indirectly, including by owning, managing, operating, joining, becoming an employee of, controlling, or participating in, a business that does "Business" in the "Restricted Area." Ex. B § 7.2.

83.     Beran further agreed in the Beran Employment Agreement to not solicit customers, consultants, or suppliers of OPG or its Affiliates in the "Restricted Area" for a period of one (1) year following the termination of his employment by OPG. Ex. B § 7.2.

84.      Beran further agreed in the Beran Employment Agreement to not solicit employees, officers, directors, employees, or agents of OPG or its Affiliates for a period of one (1) year following the termination of his employment by OPG. Ex. B § 7.2.

85.     The Beran Employment Agreement defined "Business" as including "the provision and sale of the products and services that were provided by [OPG] or any of its Affiliates during the period of time in which [Beran] was employed by [OPG] or its Affiliates or permitted assigns, excluding the provision of and sale of products and services as part of any business, product or service line, or division in which [Beran] was not directly involved as a manager or supervisor during such employment." Ex. B § 7.1. "Business" is further defined as including, without limitation, "the provision of rental services related to short and long-term living quarters supporting oil and gas drilling and production operations, drill pipe rental and related drilling tool

and accessory rental services, water and sewer services supporting delivery and removal of potable and non-potable water for oil and gas rigs and living quarters, and providing equipment and personnel to manage initial flowback and testing of oil and gas wells." Ex. B § 7.1.

86.     The Beran Employment Agreement defined the "Restricted Area" as including Arkansas, New Mexico, Oklahoma, Ohio, Pennsylvania, Texas, Wyoming, and "[a]ny other geographic area that is within a 50-mile radius of any location where [OPG] or its Affiliates or, if applicable, its successors or assigns, engages in the Business, and for which [Beran] has material responsibilities or about which [Beran] has Confidential Information, during the period that [OPG] is employed hereunder, including, but not limited to, any territory within the State of North Dakota." Ex. B § 7.1.

87.     Beran further agreed in the Beran Employment Agreement to nondisclosure obligations regarding OPG and its Affiliate's Confidential Information. Ex. B § 5.3.

88.     Beran further agreed that he owed a fiduciary duty of loyalty to OPG. Ex. B § 2.5. And he agreed to provide advanced notice to OPG before resigning. Ex. B § 3.3.

89.     The Beran Employment Agreement is governed by Texas law. Ex. B, § 9.2.

90.     The restrictive covenants in the Beran Employment Agreement are ancillary to an enforceable agreement in that Beran was provided with increased access to OPG's Confidential Information, new Confidential Information, including regarding SCF Partners, and stock options upon his signing of the Beran Employment Agreement.

91.     The restrictive covenants in the Beran Employment Agreement are enforceable because they are reasonable, including in time, geographical area, and the scope of the activity restrained.

92.     Beran breached the Beran Employment Agreement by starting and being employed by Titan—a business that is directly competitive with OPG—both during employment with OPG and after.

93.     Beran breached the Beran Employment Agreement by suddenly resigning without any advanced warning or notice in an obvious attempt to inflict harm on OPG's business.

94.     Beran breached the Beran Employee Agreement by engaging in competitive employment with Titan, which jeopardizes OPG's trade secrets and Confidential Information. In addition to the trade secrets and Confidential Information already disclosed, OPG has reason to believe that Beran will inevitably and imminently use and/or disclose OPG's trade secrets and Confidential Information in violation of the Beran Employee Agreement.

95.     Beran breached the Beran Employment Agreement by soliciting OPG's employees to leave employment with OPG to become employed by Titan.

96.     Beran breached the Beran Employment Agreement by soliciting OPG's customers to divert business from OPG to Titan.

97.     Beran breached the Beran Employment Agreement by disclosing and using OPG's Confidential Information.

98.     OPG has performed all of its obligations under the Beran Employment Agreement.

99.     As a direct and proximate cause of Beran's breaches of the Beran Employment Agreement, OPG has incurred damages. Accordingly, OPG is entitled to judgment against Beran for compensatory damages, reasonable and necessary attorneys' fees under Texas Civil Practice and Remedies Code § 38.001 and the Beran Employment Agreement, and such other and further relief to which OPG is entitled at law or in equity.

100.     Additionally, unless enjoined by this Court, Beran's ongoing breaches of the Beran Employment Agreement will cause irreparable harm to OPG, and OPG has no adequate or other remedy at law for such acts and threatened acts. OPG is entitled to injunctive relief to prevent Beran from continuing to use OPG's trade secret information and from continuing to work for Titan during the period set forth in the Beran Employment Agreement.

### Count Three: Misappropriation of Trade Secrets under Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq*. (Against All Defendants)

101.     OPG repeats and re-alleges the foregoing allegations as if fully set forth herein.

102.     In their position with OPG, Employee Defendants had access to trade secrets and other nonpublic Confidential Information that is of extraordinary value to OPG.

103.     As set forth above, OPG expended significant amounts of time and money to develop certain trade secret information, including without limitation (i) business information and materials, including, without limitation, pricing models; market and business analyses; investments or investment opportunities; growth plans; acquisition prospects; strategy; finances; business plans, methods and processes; business proposals, operations, products or services; evaluations; contract terms and conditions; pricing and bidding methodologies and data; sales data; customer information; supplier and vendor information; credit information; financial data; purchasing, pricing, bidding, selling and marketing data and contracts; (ii) technical information and materials, including, without limitation, computer programs; software; databases; methods; know-how; formulae; compositions; technological data; technological prototypes, processes, discoveries, inventions, ideas, concepts, surveys, improvements and designs; developmental or experimental work; training programs and procedures; diagrams, charts, products and services (including, without limitation, product developments, product specifications and technical specifications); (iii) information and materials relating to future plans including, but not limited

to: marketing strategies and techniques; intellectual property; projects and proposals; acquisition and financing plans; strategic alliances; production processes; and research and development efforts; and (iv) any other information that gives OPG or its affiliates an advantage with respect to its competitors by virtue of not being known by those competitors. This information constitutes "trade secrets" under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq*.

104.    OPG has made concerted efforts to maintain the secrecy of its trade secrets and to prevent the unauthorized disclosure or use of its trade secret information through, among other measures, (a) requiring employees like Employee Defendants to sign employee and/or restrictive covenant agreements containing nondisclosure, noncompetition, and other restrictive covenants; (b) having policies that are designed to identify and protect its trade secrets; (c) requiring its employees to use passwords to protect OPG's systems containing Confidential Information (including, for example, multiple layers of passwords and multifactor authentication) and prohibiting the sharing of passwords; (d) limiting access to trade secrets to those employees who need to know the information in order to perform their roles for OPG; (e) terminating employees' access to OPG's systems when employees are terminated or resign; (f) requiring third parties to sign confidentiality agreements prior to OPG's disclosure of trade secrets to them; (g) training employees on the importance of protecting OPG's trade secrets; and (h) implementing technological and other physical barriers, including, for example, restricting access to its buildings and offices, and other mechanisms that prevent unauthorized access to, and transfers of, its trade secrets.

105.    OPG's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other companies or individuals (in OPG's industry or elsewhere) who could obtain an advantage from it. OPG provided

Defendants access to its trade secret information for the limited purpose of their use of this information during the scope of their employment for OPG for the benefit of OPG.

106.    This information is used in interstate commerce by OPG—a Delaware entity with its principal place of business in Texas—which utilizes this trade secret information in its businesses across the United States.

107.    Without informing OPG, Employee Defendants started and became employed by Titan, a direct competitor of OPG, in violation of their Employment Agreements. Employee Defendants' positions with Titan are ones in which Employee Defendants' disclosure and/or use of Employee Defendants' trade secrets and Confidential Information would be unavoidable and inevitable, thereby constituting misappropriation of OPG's trade secrets in violation of the DTSA. Further, Employee Defendants have already used and disclosed to Titan and Titan is using OPG's trade secrets and Confidential Information, including without limitation OPG's expense reports, to compete against OPG.

108.    Unless enjoined by this Court, Defendants' misappropriation of OPG's trade secrets will cause significant irreparable harm to OPG, and OPG has no adequate or other remedy at law for such acts and threatened acts. Irreparable harm is presumed when trade secrets, such as OPG's trade secret information, have been misappropriated. As such, OPG is entitled to a temporary restraining order and preliminary and permanent injunctive relief.

109.    As a direct, proximate, and foreseeable result of Defendants' misappropriation of OPG's trade secrets, OPG has been damaged in an amount to be determined at trial and is entitled to recover attorneys' fees and expenses from Defendants under the DTSA.

**Count Four: Misappropriation of Trade Secrets under Texas Uniform Trade Secrets Act, TEX. CIV. PRAC. & REM. CODE § 134A (Against All Defendants)**

110.    OPG repeats and re-alleges the foregoing allegations as if fully set forth herein.

**ORIGINAL COMPLAINT**                                              **Page 28**

111.    In their positions with OPG, Employee Defendants had access to trade secrets and other nonpublic Confidential Information that is of extraordinary value to OPG.

112.    As set forth above, OPG expended significant amounts of time and money to develop certain trade secret information, including without limitation (i) business information and materials, including, without limitation, pricing models; market and business analyses; investments or investment opportunities; growth plans; acquisition prospects; strategy; finances; business plans, methods and processes; business proposals, operations, products or services; evaluations; contract terms and conditions; pricing and bidding methodologies and data; sales data; customer information; supplier and vendor information; credit information; financial data; purchasing, pricing, bidding, selling and marketing data and contracts; (ii) technical information and materials, including, without limitation, computer programs; software; databases; methods; know-how; formulae; compositions; technological data; technological prototypes, processes, discoveries, inventions, ideas, concepts, surveys, improvements and designs; developmental or experimental work; training programs and procedures; diagrams, charts, products and services (including, without limitation, product developments, product specifications and technical specifications); (iii) information and materials relating to future plans including, but not limited to: marketing strategies and techniques; intellectual property; projects and proposals; acquisition and financing plans; strategic alliances; production processes; and research and development efforts; and (iv) any other information that gives OPG or its affiliates an advantage with respect to its competitors by virtue of not being known by those competitors. This information constitutes "trade secrets" under the Texas Uniform Trade Secrets Act (**"TUTSA"**), TEX. CIV. PRAC. & REM. CODE § 134A.

113.    OPG has made concerted efforts to maintain the secrecy of its trade secrets and to prevent the unauthorized disclosure or use of its trade secret information through, among other measures, (a) requiring employees like Employee Defendants to sign employee and/or restrictive covenant agreements containing nondisclosure, noncompetition, and other restrictive covenants; (b) having policies that are designed to identify and protect its trade secrets; (c) requiring its employees to use passwords to protect OPG's systems containing Confidential Information (including, for example, multiple layers of passwords and multifactor authentication) and prohibiting the sharing of passwords; (d) limiting access to trade secrets to those employees who need to know the information in order to perform their roles for OPG; (e) terminating employees' access to OPG's systems when employees are terminated or resign; (f) requiring third parties to sign confidentiality agreements prior to OPG's disclosure of trade secrets to them; (g) training employees on the importance of protecting OPG's trade secrets; and (h) implementing technological and other physical barriers, including, for example, restricting access to its buildings and offices, and other mechanisms that prevent unauthorized access to, and transfers of, its trade secrets.

114.    Without informing OPG, Employee Defendants started and became employed by Titan, a direct competitor of OPG, in violation of their Employment Agreements. Employee Defendants' positions with Titan are ones in which it is not possible for Employee Defendants not to make use of the trade secrets and Confidential Information that they learned from their roles at OPG, thereby misappropriating OPG's trade secrets in violation of the TUTSA. Further, Employee Defendants have already used and disclosed to Titan and Titan is using OPG's trade secrets and Confidential Information, including without limitation OPG's expense reports, to compete against OPG.

115.    Unless enjoined by this Court, Defendants' misappropriation of OPG's trade secrets will cause significant irreparable harm to OPG, and OPG has no adequate or other remedy at law for such acts and threatened acts. Irreparable harm is presumed when trade secrets, such as OPG's trade secret information, have been misappropriated. As such, OPG is entitled to a temporary restraining order and preliminary and permanent injunctive relief.

116.    As a direct, proximate, and foreseeable result of Defendants' misappropriation of OPG's trade secrets, OPG has been damaged in an amount to be determined at trial and are also entitled to attorneys' fees and expenses under TUTSA.

### Count Five: Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Against Employee Defendants)

117.    OPG repeats and re-alleges the foregoing allegations as if fully set forth herein.

118.    The Computer Fraud and Abuse Act, 18 U.S.C. § 1030, provides that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

119.    Employee Defendants, individually and as agents of Titan, knowingly and intentionally accessed, deleted, downloaded, copied, took, and/or stole OPG's confidential business and proprietary information and trade secrets, without authorization, from certain OPG computers and/or computer network. All information created, sent, received, or stored on OPG's electronic resources was the property of OPG.

120.    OPG's computers and computer systems are "protected computers" as that term is defined in 18 U.S.C. § 1030(e)(2)(B) because they are used in interstate commerce and communication in the course of OPG's business.

121.     Employee Defendants knowingly and intentionally accessed OPG's computer network without authorization and/or exceeded their authorized access, and thereafter accessed information before deleting and/or otherwise destroying information from a protected computer in violation of, among others, 18 U.S.C. § 1030(a)(2)(c).

122.     As a result of Employee Defendants' conduct, OPG has suffered damages and loss to its computers and business, including specifically impairment of the integrity and/or availability of certain data and/or information in OPG's computers, and will likely incur costs in recovering and restoring its data and information, in an amount that shall be determined at trial.

123.     OPG has suffered further injury and harm in the loss of its confidential business and proprietary information and trade secrets which were misappropriated by Employee Defendants. As OPG's investigation efforts remain ongoing, it is currently unable to state the full extent of such loss/misappropriation.

124.     In addition to the aforementioned damages, OPG also seeks injunctive relief to enjoin Employee Defendants' continued and/or future use and misappropriation of OPG's confidential business and proprietary information and trade secrets, and for the return of OPG's confidential business and proprietary information and trade secrets.

### Count Six: Conversion (Against All Defendants)

125.     OPG repeats and re-alleges the foregoing allegations as if fully set forth herein.

126.     Defendants, without authorization or consent, have wrongfully accessed, converted, and used property belonging to OPG, including without limitation OPG's expense reports. Accordingly, Defendants have exercised dominion over OPG's property in a manner that is improper and without authorization.

127.     Defendants' conversion of OPG's property has proximately caused OPG to suffer damages within the jurisdictional limits of this Court. Accordingly, OPG is entitled to judgment against Defendants for compensatory and exemplary damages and such other and further relief to which OPG is entitled at law or in equity.

### Count Seven: Breach of Fiduciary Duties (Against Employee Defendants)

128.     OPG repeats and re-alleges the foregoing allegations as if fully set forth herein.

129.     By the nature of their employment and positions with OPG, there was a fiduciary relationship between each of the Employee Defendants and OPG, by which each of the Employee Defendants owed a fiduciary duty to OPG.

130.     Elzner breached his fiduciary duty to OPG through his actions purporting to terminate the employment agreements of employees at OPG, including without limitation his *own* employment agreement and Beran's employment agreement, without the proper authorization of the OPG Board. Elzner further breached his fiduciary duty to OPG by starting a business that is competitive to OPG, while employed by OPG, and his above-outlined strategic campaign to compete against OPG, including through use of OPG's funds and resources for those efforts.

131.     Employee Defendants breached their fiduciary duties to OPG through the misappropriation of OPG's confidential information and use of OPG's confidential information to unfairly compete against OPG, as well as a deletion of a substantial number of emails prior to their resignations.

132.     Employee Defendants' breaches of fiduciary duties have caused a benefit to Defendants and Employee Defendants' breaches of fiduciary duties have proximately caused OPG to suffer injury, both damages and irreparable harm. Accordingly, OPG is entitled to judgment

against Employee Defendants for damages and such other and further other relief, including injunctive relief, to which OPG is entitled at law or in equity.

### Count Eight: Knowing Participation in Breach of Fiduciary Duties (Against Titan)

133.    OPG repeats and re-alleges the foregoing allegations as if fully set forth herein.

134.    By the nature of their employment and positions with OPG, there was a fiduciary relationship between Elzner, Beran, Lenae Beran, and OPG, by which each of them owed a fiduciary duty to OPG.

135.    Titan had knowledge that Elzner, Beran, and Lenae Beran, among others, were employees of OPG and had a fiduciary relationship with OPG.

136.    Elzner breached his fiduciary duty to OPG by starting a business that is competitive to OPG, while employed by OPG, and his above-outlined strategic campaign to compete against OPG, including through use of OPG's funds and resources for those efforts.

137.    Elzner, Beran, and Lenae Beran breached their fiduciary duties to OPG through the misappropriation of OPG's confidential information and use of OPG's confidential information to unfairly compete against OPG.

138.    Titan was aware of and participated in the above breaches of fiduciary duties.

139.    Titan's participation in the breaches of fiduciary duties have caused a benefit to Titan and Titan's participation in the breaches of fiduciary duties have proximately caused OPG to suffer injury, both damages and irreparable harm. Accordingly, OPG is entitled to judgment against Titan for damages and such other and further other relief, including injunctive relief, to which OPG is entitled at law or in equity.

### Count Nine: Tortious Interference with Existing Relationships (Against All Defendants)

140.    OPG repeats and re-alleges the foregoing allegations as if fully set forth herein.

141.   OPG had business relationships with many customers related to, among other things, the services, housing, and equipment rental it provides to customers in the oil and gas industry.

142.   OPG had an employment relationship with Employee Defendants and at least seven other employees who have ended their employment relationships with OPG to go to work for Titan, a direct competitor of OPG.

143.   Defendants have knowingly, willfully, and with intent to harm OPG induced at least two existing OPG customers, worth millions in annual revenue to OPG, to divert business from OPG to Titan.

144.   Elzner has knowingly, willfully, and with intent to harm OPG induced Beran to terminate his employment with OPG and violate the Beran Employment Agreement to become employed by Titan, a direct competitor of OPG.

145.   Defendants have knowingly, willfully, and with intent to harm OPG induced at least seven other OPG employees to terminate their employment with OPG to become employed by Titan, a direct competitor of OPG.

146.   Defendants' actions were unlawful and taken without justification or excuse.

147.   Defendants' actions were motivated by malice.

148.   Defendants' interference proximately caused OPG injury in the form of lost revenues from ongoing and prospective business with existing customers and other damages. OPG has suffered actual damages and loss as a proximate result in an amount to be proved at trial.

## Count Ten: Tortious Interference with Prospective Business Relationships (Against All Defendants)

149.   OPG repeats and re-alleges the foregoing allegations as if fully set forth herein.

150.     OPG has ongoing business relationships with many customers related to, among other things, the services, housing, and equipment rental it provides to customers in the oil and gas industry.

151.     Defendants have induced at least two existing customers, worth millions in annual revenue to OPG, to divert business from OPG to Titan. There was a reasonable probability that OPG's relationships with those customers would have continued under the existing and/or additional future contracts between OPG and the customers.

152.     Defendants willfully and intentionally interfered with OPG's prospective relationships with OPG's customers, by knowingly soliciting and encouraging OPG's customers to divert business from OPG to Titan.

153.     Defendants' interference proximately caused OPG injury in the form of lost revenues from ongoing and prospective business with existing customers. OPG has suffered actual damages and loss as a proximate result in an amount to be proved at trial.

### Count Eleven: Tortious Interference with Existing Contracts (Against Titan)

154.     OPG repeats and re-alleges the foregoing allegations as if fully set forth herein.

155.     Employee Defendants had Employment Agreements with OPG containing nondisclosure and restrictive covenants obligations.

156.     Titan's employment of Employee Defendants and use of OPG's confidential information is a willful and intentional act of interference with the Employment Agreements.

157.     Titan's interference with the Employment Agreements proximately caused OPG injury in the form of lost revenues from ongoing and prospective business with existing customers and other damages.

158.     OPG has suffered actual damages and loss as a proximate result in an amount to be proved at trial.

## **Count Twelve: Civil Conspiracy (Against All Defendants)**

159.     OPG repeats and re-alleges the foregoing allegations as if fully set forth herein.

160.     Defendants, who are two or more persons, were members of a common conspiracy, among themselves, Lenae Beran, and Danette Mares.

161.     The object of the conspiracy was to accomplish a litany of unlawful purposes: misappropriate trade secret information belonging to OPG, unlawfully develop a competing business based on trade secret information belonging to OPG, induce OPG employees to breach their fiduciary duties to OPG, and  induce employees and customers of employees of OPG to end employment or divert business from OPG.

162.     Defendants and co-conspirators collectively had a meeting of the minds to engage in the course of action in order to further their own success at OPG's expense.

163.     Defendants and co-conspirators, either directly or through agents acting on their behalf, committed the overt acts of misappropriation of trade secrets, tortious interference with existing contracts and prospective business relations, breach of fiduciary duties, and breach of contract, among other overt acts.

164.     OPG has suffered actual damages as a proximate result of Defendants' conduct. Accordingly, OPG is entitled to judgment against Defendants for damages and such other and further relief to which OPG is entitled at law or in equity.

165.     Under Texas law, Defendants are jointly and severally liable for all acts done by them in furtherance of their unlawful conduct.

## ATTORNEYS' FEES AND COSTS

OPG seeks reasonable and necessary attorneys' fees and costs against Defendants under Texas Civil Practice and Remedies Code § 38.001, DTSA, and/or TUTSA, as well as the terms of the Employment Agreements.

## JURY DEMAND

Plaintiff hereby demands a trial of this action by jury.

## PRAYER FOR RELIEF

Wherefore, OPG requests that judgment be entered in its favor and against Defendants as follows:

    a.    Ordering that Employee Defendants are liable for:

        i.    Breaching their contracts with OPG;

        ii.    Violating the DTSA;

        iii.    Violating TUTSA;

        iv.    Violating the CFAA;

        v.    Conversion;

        vi.    Breaching their fiduciary duties to OPG;

        vii.    Tortiously interfering with OPG's existing relationships with customers and employees;

        viii.    Tortiously interfering with OPG's prospective business relationships; and

        ix.    Civil conspiracy.

    b.    Ordering that Tian is liable for:

        i.    Violating the DTSA;

        ii.    Violating TUTSA;

    iii.    Conversion;

    iv.    Knowing participation in breach of fiduciary duties to OPG;

    v.    Tortiously interfering with OPG's existing relationships with customers and employees;

    vi.    Tortiously interfering with Elzner and Beran's Employment Agreements with OPG;

    vii.    Tortiously interfering with OPG's prospective business relationships; and

    viii.    Civil conspiracy.

c.    Upon application, a temporary restraining order, a preliminary injunction, and a permanent injunction:

    i.    Enjoining Employee Defendants from breaching or failing to comply with the terms of their Employment Agreements, including the nondisclosure (confidentiality) and restrictive covenant provisions contained therein, during the time period of the restrictive covenants;

    ii.    Enjoining Employee Defendants from continuing to be employed by Titan and otherwise unlawfully competing against OPG;

    iii.    Enjoining Employee Defendants from carrying on or engaging directly or indirectly in the Business in the Restricted Area. For clarity, this injunction includes but is not limited to directly or indirectly, (A) owning, managing, operating, joining, becoming an employee of, controlling or participating in any business or person which engages in the Business or (B) loaning money to or sell or leasing equipment to any business or person which engages in the Business;

iv.   Enjoining Employee Defendants from, or anyone acting or purporting to act on their behalf from, canvassing, soliciting, approaching or enticing away, or causing to be canvassed, solicited, approached or enticed away, any customer, consultant or supplier of the OPG or its affiliates that was a customer, consultant or supplier of OPG or its affiliates in the Restricted Area;

v.   Enjoining Defendants from, or anyone acting or purporting to act on their behalf from, accessing, using, disclosing, distributing, disseminating, or discussing OPG's trade secrets, Confidential Information, and other confidential information;

vi.   Ordering Defendants, and anyone acting or purporting to act in concert or participation with them, to return to OPG all information, documents, and tangible things in their possession, custody, or control (if any), whether in physical or digital format, including any and all copies thereof, that contain OPG's trade secrets and other confidential information; and

vii.   Ordering Defendants to produce their personal and/or work computers, phones, iPads, personal digital assistants (PDAs), flash drives and other similar electronic devices, and give access to any electronic email accounts to an independent third-party forensic analyst selected by OPG for imaging and forensic examination.

d.   Declaring that Defendants are jointly and severally liable for the damages owed for civil conspiracy;

e.   Declaring that all Defendants are jointly and severally liable for the damages owed for knowingly and joint participation in breaches of fiduciary duties;

**ORIGINAL COMPLAINT**                                                                 **Page 40**

f.      Awarding actual, compensatory, and/or consequential damages to OPG in an amount to be determined at trial;

g.      Awarding exemplary damages to OPG in an amount to be determined at trial;

h.      Ordering an accounting of all Defendants' disclosures and/or uses of OPG's trade secrets and Confidential Information;

i.      Ordering an accounting of all profits, benefits, and/or other compensation provided to or derived by Defendants through their wrongful conduct;

j.      Ordering disgorgement and/or clawback of all benefits, stock, and/or other compensation provided to or derived by Employee Defendants due to their breaches of fiduciary duties and other obligations to OPG;

k.      Awarding OPG reasonable and necessary attorneys' fees, costs, and related expenses incurred in bringing and prosecuting this action;

l.      Awarding pre-judgment and post-judgment interest at the highest lawful rates; and

m.      Awarding all such other and further relief that OPG may be entitled to in law or equity.[4]

---

[4] In the alternative, if the Court finds that the noncompete covenant contained in the Employment Agreements are not reasonable in time, geographic area, or scope of activity, OPG requests that the Court modify the Employment Agreements where necessary to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interests of OPG and enforce the Employment Agreements as reformed. *See*, TEX. BUS. & COM. CODE § 15.51(c).

ORIGINAL COMPLAINT                                                              **Page 41**

Date: June 20, 2023                    Respectfully submitted,

                                       **HAYNES BOONE LLP**

                                       By: */s/ Michael J. Lombardino*

                                       Michael J. Lombardino
                                       Texas State Bar No. 24070159
                                       Michael.Lombardino@haynesboone.com
                                       1221 McKinney Street, Suite 4000
                                       Houston, Texas 77010
                                       Telephone: 713.547.2301
                                       Facsimile: 713.547.2600

                                       Laura E. O'Donnell
                                       Texas State Bar No. 00797477
                                       Laura.ODonnell@haynesboone.com
                                       Henson Adams
                                       Texas State Bar No. 24101418
                                       Henson.Adams@haynesboone.com
                                       112 East Pecan Street, Suite 1200
                                       San Antonio, Texas 78205
                                       Telephone: 210.978.7414
                                       Facsimile: 210.554.0457

                                       **ATTORNEYS FOR**
                                       **OIL PATCH GROUP, INC.**

4879-4325-0537