**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **OIL PATCH GROUP, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.** <u>4:23-cv-02268</u> |
| | § | |
| **DEREK ELZNER,** | § | |
| **DWAYNE "BUBBA" BERAN,** | § | |
| **TITAN ACCOMMODATIONS, LLC** | § | |
| | § | |
| **Defendants.** | § | |

## APPLICATION FOR TEMPORARY RESTRAINING ORDER

## <u>TABLE OF CONTENTS</u>

I.  WHY WE ARE HERE ................................................................................ 1

II.  FACTUAL BACKGROUND ..................................................................... 3

III. ARGUMENTS AND AUTHORITIES ...................................................... 3

    A.  Legal standards for TROs. ..................................................................... 3

    B.  OPG will succeed on the merits of its breach of contract claim. ................... 4

        1.  Beran and Elzner are bound by enforceable Employment Agreements, which
           include reasonable restrictive covenants. ................................................ 4

           a)  The restrictive covenants are in the Employment Agreements. ..................... 8

           b)  Despite Elzner's best efforts, the restrictive covenants in the Employment
              Agreements remain in full force and effect. ............................................ 9

           c)  The Employment Agreements contain reasonable restrictions. ..................... 12

           d)  The Employment Agreements are narrowly tailored to protect OPG's
              confidential information and business goodwill. ...................................... 14

        2.  Elzner and Beran breached the valid restrictive covenants. ............................. 15

    C.  OPG will succeed on the merits of its Defend Trade Secrets Act and Texas
        Uniform Trade Secrets Act claims. ........................................................ 16

    D.  OPG has suffered and will continue to suffer irreparable harm if Defendants'
        wrongful and unlawful conduct is not enjoined. ........................................ 18

    E.  The balance of the equities favors OPG. .................................................. 19

    F.  The public interest supports injunctive relief. ........................................... 20

IV. CONCLUSION ....................................................................................... 20

## I.    <u>WHY WE ARE HERE</u>

Plaintiff Oil Patch Group, Inc. (**"OPG"** or **"Plaintiff"**) is facing immediate and irreparable harm.  Several former high-ranking employees, including the President, Derek Elzner (**"Elzner"**), and a Director, Dwayne "Bubba" Beran (**"Beran"**), violated their restrictive covenants with OPG by using OPG's trade secrets and confidential information to intentionally establish a competing business—Titan Accommodations, LLC (**"Titan"**) (Titan, Elzner and Beran collectively **"Defendants"**)—and impermissibly solicit OPG's valued customers and employees.  Defendants have already been able to divert business worth millions in dollars of revenue from OPG to Titan. OPG seeks immediate injunctive relief to prevent further irreparable harm from occurring.

While only recently unveiled to OPG, Beran and Elzner's scheme involved years of thoughtful and conscious planning, and implicates several other former high-level OPG employees. Unbeknownst to OPG, Elzner impermissibly attempted to terminate his *own* employment agreement—and the employment agreements of several other highly valued employees, including Beran—just before OPG's stock was combined with other companies in 2017. These employment agreements contain precise and reasonable restrictive covenants, including non-disclosure, non-compete and non-solicit provisions aimed at protecting OPG's resources, business goodwill, and proprietary trade secrets and confidential information.

His *attempted* terminations of the employment agreements failed. Apart from the obvious voidability of his actions due to improper self-dealing, *that* type of corporate action would have been a material act requiring full approval of the Board of Directors.[1]  The employment agreements also contain a survival clause: even if his attempted termination of the employment agreements

---

[1] In 2013, SCF-VIII, L.P. (**"SCF"**), a private equity fund managed by SCF Partners, acquired a majority stake in OPG. As part of the transaction Elzner received cash and stock and both received stock options in OPG.  In conjunction with that transaction, on November 14, 2013, Elzner and Bubba each signed the employment agreements in question.  Because the employment agreements were material to that transaction, cancelling them would likewise be a material action.

was effective (it was not), the restrictive covenants would have survived.  The only possible justification for Elzner's attempted termination of the employment agreements confirms Beran and Elzner had been intending to compete directly with OPG for a long time.

After Elzner's failed attempts to terminate the employment agreements, Elzner and his cohorts remained employed with OPG until April 2023 when they resigned. Two months earlier (February 2023), however, Elzner—*while still employed as OPG's President*—secretly formed Titan, naming himself as its managing member. Like OPG, Titan was formed to provide oilfield rental housing and other related services. Two months after forming Titan, Elzner and his crew started resigning without notice or warning. Elzner resigned first; followed by his lieutenant, Beran; and seven other OPG employees beginning two days after that—all without any prior notice.  Immediately after resigning from OPG, Elzner and his cohorts began blatantly competing against OPG. In the days that followed, two of OPG's largest customers, which account for millions in annual revenue, notified OPG of their intent to move business from OPG to Titan.

OPG promptly sent Beran, Elzner and the other former employees letters reminding them of their continuing post-employment legal obligations. Through their attorney, Beran and Elzner first claimed in response that Elzner had previously "terminated" their employment agreements, including the restrictive covenants in them. They also assured OPG they did not have and were not using any confidential OPG information or property. In reply, OPG's attorney explained that—for multiple reasons—Beran and Elzner's **obligations survived** the attempted terminations of the employment agreements; OPG's attorney also demanded the return of OPG's confidential information and that Beran and Elzner cease and desist from their unlawful conduct.

Contrary to Defense counsel's representations, Defendants and the other former employees **wrongfully took, and now possess *and are using*** OPG's trade secret and confidential

**information**. On June 1, 2023, a former employee of OPG—Beran's wife who also left OPG to go work for Titan—emailed a Titan expense report to Beran's old OPG email address. Besides changing the corporate name at the top from OPG to Titan, the Titan expense report is an ***exact*** replica of OPG's confidential and trade secret expense reports. The Titan expense report even still contains a reference to "OPG" in the small print in the bottom right of the expense report.

The stolen OPG expense report confirms Defendants improperly retained OPG's trade secret and confidential information; and it substantiates how Titan was able to become a direct competitor of OPG so-quickly and efficiently. No start-up costs! Defendants got a head start by leveraging OPG's confidential and trade secret information—which OPG spent years and valuable resources developing—to launch a fully-capable company positioned to immediately begin competing with OPG's business and raiding OPG's customers and employees.

For these and the reasons below, pursuant to FED. R. CIV. P. 65(b), OPG hereby moves for a temporary restraining order (**"TRO"**) enjoining Elzner and Beran from continuing to violate their employment agreements and restrictive covenants with OPG by working for Titan and soliciting OPG's valued customers and employees, and enjoining Defendants from continuing to use OPG's trade secrets in those and any other business efforts.

## II.     FACTUAL BACKGROUND

For purposes of brevity, OPG incorporates by reference herein the Original Complaint (**"Compl."**) and the Declaration of David Osburn (**"Decl."**), filed herewith on June 20, 2023, which detail Defendants' actions and their unlawful conduct.

## III.     ARGUMENTS AND AUTHORITIES

### A.     Legal standards for TROs.

Injunctive relief is available if OPG establishes: **(1)** a substantial likelihood of success on the merits; **(2)** a substantial threat of irreparable injury if the injunction is not issued; **(3)** that the

threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and **(4)** that the grant of an injunction will not disserve the public interest.[2]

Although OPG must demonstrate it is likely to prevail on the merits of its claim, the "likelihood of succeeding on the merits need not be one of absolute certainty."[3] When seeking a TRO, OPG need not prove its case.[4]  OPG instead need only show a reasonable probability of success.[5] The inquiry focuses solely on the substantive merits of the claim, not on any potential procedural obstacles.[6] As set forth below, OPG proffers evidence with this Application showing that it will succeed on at least three of its claims against Defendants.

**B.**     **OPG will succeed on the merits of its breach of contract claim.**

The employment agreements at issue provide that Texas law, without regard to any conflict of law rules, governs the agreements. Decl. ¶ 18; Exs. A, B § 7.2(a).[7] To prevail on a claim for breach of contract under Texas law, a party must show the existence of a valid contract, performance or tendered performance by the plaintiff, breach of the contract by the defendant and damages to the plaintiff resulting from that breach.[8]

**1.**     **Beran and Elzner are bound by enforceable Employment Agreements, which include reasonable restrictive covenants.**

On November 14, 2013, in exchange for their receipt of stock units, confidential information, and other consideration, Beran and Elzner each executed Employment Agreements

---

[2] *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *Intel Corp. v. Rais*, No. 1:19-cv-20-rp, 2019 WL 164958, at *3 (W.D. Tex. Jan. 10, 2019).
[3] *Sebastian v. Tx. Dep't of Corrections*, 541 F. Supp. 970, 975 (S.D. Tex. 1982).
[4] *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 n.11 (5th Cir. 1991).
[5] *Incubus Invs., L.L.C. v. City of Garland*, No. Civ.A. 303CV2039-K, 2003 WL 23095680, at *3 (N.D. Tex. Dec. 17, 2003).
[6] *Janvey v. Alguire*, 647 F.3d 585, 599 (5th Cir. 2011).
[7]  Defendant Elzner's employment agreement is referred to herein as the **"Elzner Employment Agreement"** (Ex. A) and Defendant Beran's employment agreement is referred to herein as the **"Beran Employment Agreement"** (Ex. B).
[8]  *Scott v. Sebree*, 986 S.W.2d 364, 372 (Tex. App.—Austin 1999, writ denied); *St. Paul Ins. Co. v. Rakkar*, 838 S.W.2d 622, 629 (Tex. App.—Dallas 1992, writ denied).

**APPLICATION FOR TEMPORARY RESTRAINING ORDER**                                              **PAGE 4**

as part SCF Partners' acquisition of a majority stake in OPG (the **"Employment Agreements"**).[9]

Beran and Elzner expressly agreed, among other things, that for a period of one year following the

termination of their employment:

> other than on behalf of the Company or any of its Affiliates, [they] will
> refrain from carrying on or engaging directly or indirectly in the Business in
> the Restricted Area. Employee[s] further agrees and covenants that, because
> the following conduct would effectively constitute carrying on or engaging
> in the Business, [they] will not, and [they] will cause [their] Affiliates not to,
> in the Restricted Area during the Prohibited Period, other than on behalf of
> the Company or its Affiliates, directly or indirectly, (A) own, manage,
> operate, join, become an employee of, control or participate in any business
> or Person which engages in the Business or (B) loan money to or sell or lease
> equipment to any business or Person which engages in the Business.[10]

In recognition of their direct relationship with OPG's customers and the resources and time

OPG invested developing good will with those customers, Beran and Elzner agreed:

> [they] will not, and [they] will cause [their] Affiliates not to, canvass, solicit,
> approach or entice away, or cause to be canvassed, solicited, approached or
> enticed away, any customer, consultant or supplier of the Company or its
> Affiliates that was a customer, consultant or supplier of the Company or its
> Affiliates in the Restricted Area during the period during which
> Employee[s] is employed by the Company or any of its Affiliates.[11]
>
> . . . [and] [they] will not, and [they] will cause [their] Affiliates not to,
> engage or employ, or solicit or contact with a view to the engagement or
> employment of, any Person who is an officer, director, employee or agent
> of the Company or its Affiliates.[12]

Since their roles at OPG had influence across North America, the non-compete and non-

solicit restrictions in the Employment Agreements define the "Restricted Area" as follows:

> 1. The State of Arkansas
> 2. The State of New Mexico
> 3. The State of Oklahoma
> 4. The State of Ohio
> 5. The State of Pennsylvania
> 6. The State of Texas
> 7. The State of Wyoming
> 8. Any other geographic area that is within a 50-mile radius of any location

---

[9] Decl. ¶ 17; *see also supra,* at note 1.
[10] Decl. ¶ 18; Exs. A, B § 7.2(a).
[11] Decl. ¶ 18; Exs. A, B § 7.2(c).
[12] Decl. ¶ 18; Exs. A, B § 7.2(d).

**APPLICATION FOR TEMPORARY RESTRAINING ORDER**                    **PAGE 5**

> where the Company or its Affiliates or, if applicable, its successors or
> assigns, engages in the Business, and for which Employee has material
> responsibilities or about which Employee has Confidential Information,
> during the period that Employee is employed hereunder, including, but not
> limited to, any territory within the State of North Dakota.[13]

Beran and Elzner also expressly acknowledged "the limitations as to time, geographical area and scope of activity to be restrained [by the restrictive covenants] are reasonable and do not impose any greater restraint than is necessary to protect the legitimate business interests of [OPG]."[14]  They likewise agreed to reformation of the restrictive covenants in the Employment Agreements if a court of competent jurisdiction determines them unreasonable in scope.[15]  Beran and Elzner further understood and agreed:

> money damages would not be sufficient remedy for any breach of this
> Article VII by Employee[s], and the Company and its Affiliates shall be
> entitled to enforce the provisions . . . by . . . obtaining specific performance
> and injunctive relief as remedies for such breach or any threatened breach.
> Such remedies shall not be deemed the exclusive remedies for a breach of
> this Article VII but shall be in addition to all remedies available at law or
> in equity, including, without limitation, the recovery of damages from
> Employee[s] and Employee[s]' agents.[16]

In addition to the restrictive covenants in the Employment Agreements, Beran and Elzner contractually agreed to abide by robust confidentiality obligations:

> . . . Employee[s] agrees that Employee[s] will not, at any time during or
> after Employee[s]' employment with the Company, make any unauthorized
> disclosure of, and Employee[s] shall not remove from the Company
> premises or other authorized premises, Confidential Information . . . or
> make any use thereof. . . Employee[s] expressly acknowledges and agrees
> that Employee[s] will not place [themselves] in a position to make
> unauthorized use or disclosure (whether actually or inevitably) of the
> Company's Confidential Information. . . . .[17]

The Employment Agreements also contain provisions ensuring OPG's confidential and trade secret information would be promptly returned to OPG:

---

[13] Decl. ¶ 18; Exs. A, B.
[14] Decl. ¶ 18; Exs. A, B § 7.3.
[15] Decl. ¶ 18; Exs. A, B § 7.5.
[16] Decl. ¶ 18; Exs. A, B § 7.3.
[17] Decl. ¶ 18; Exs. A, B § 5.3.

**APPLICATION FOR TEMPORARY RESTRAINING ORDER**                                    **PAGE 6**

> Upon termination of Employee[s]' employment with the Company, Employee[s] shall promptly deliver to the Company all documents, materials (including electronically stored information) and other tangible items constituting, containing or derived from Confidential Information in Employee[s]' possession, custody or control. . . . Employee[s] agree[] that all Confidential Information of the Company (whether now or hereafter existing) conceived, discovered or made by Employee[s] during the period of Employee[s]' employment by the Company exclusively belongs to the Company (and not to Employee[s]) . . . .[18]

Without any prior notice or warning, Beran and Elzner promptly resigned from OPG in late April 2023.[19] They did not tell OPG why they had suddenly resigned—let alone that they had formed a new business or that the business would be providing the same or similar services as those provided by OPG.[20] Nor did they provide any information about their new employer, including the name of their new employer, the location of their new employment, their roles at the new employer, or whether they had told their new employer about the Employment Agreements.[21]

The Employment Agreements contain valid and reasonable non-compete, non-solicit, and confidentiality provisions. Covenants not to compete are enforceable when they meet the requirements set forth in TEX. BUS. & COM. CODE §§ 15.50-52 (the **"Act"**). Non-solicitation agreements, like non-competition agreements, are governed by Section 15.50 of the Act.[22] Under Texas law, non-compete and non-solicit provisions are enforceable if they are: **(i)** "ancillary to or part of an otherwise enforceable agreement at the time the agreement is made"; **(ii)** reasonable "to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained"; and **(iii)** "do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee."[23] "The hallmark of enforcement is whether or not the

---

[18] Decl. ¶ 18; Exs. A, B § 5.3.
[19] *See* Decl. ¶ 23.
[20] *See* Decl. ¶ 23.
[21] *See* Decl. ¶ 23.
[22] *York v. Hair Club For Men, L.L.C.*, No. 01-09-00024-CV, 2009 WL 1840813, at *4 (Tex. App.—Houston [1st Dist.] June 25, 2009, no pet.).
[23] The Act at § 15.50.

**APPLICATION FOR TEMPORARY RESTRAINING ORDER**                                      **PAGE 7**

covenant is reasonable."[24] The restrictive covenants at issue in this case are reasonable.

### a)      The restrictive covenants are in the Employment Agreements.

The Employment Agreements are enforceable because Defendants received valuable consideration, including their receipt of stock units and continued employment, in exchange for entering into the Employment Agreements.[25]

The Employment Agreements are also enforceable because they contain reciprocal promises concerning the exchange of OPG's confidential information. According to the Texas Supreme Court, non-compete and non-solicit agreements may be enforced when confidential information is promised, a reciprocal promise not to divulge that information is made, and the confidential information is later provided.[26] In the Employment Agreements at issue, OPG exchanged reciprocal promises with Beran and Elzner.[27] After they signed the Employment Agreements, OPG continued to employ them and provide extensive access to OPG's confidential information, including new confidential information related to its affiliate SCF Partners, which had purchased a majority interest in OPG in conjunction with the execution of the Employment Agreements.[28] The mutual exchange of promises regarding OPG's confidential information— coupled with Beran and Elzner's subsequent receipt of such information—constitutes separate and independent consideration for the Employment Agreements' enforceability.

Finally, the Texas Supreme Court has upheld non-competition agreements when they are designed to protect the company's goodwill, including customer relationships.[29] Indeed, the Court

---

[24] *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 777 (Tex. 2011).
[25] Decl. ¶ 18; Exs. A, B § 7.2; *see also supra*, at note 1.
[26] *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 650-55 (Tex. 2006) (holding noncompete agreement enforceable when employer "promised to disclose confidential information and to provide specialized training under the Agreement, and [employee] promised not to disclose confidential information").
[27] Decl. ¶ 18; Exs. A, B § 7.2.
[28] *See* Decl. ¶ 17.
[29] *See Marsh*, 354 S.W.3d at 777, 780.

has specifically stated that goodwill was a business interest worthy of protection under the Act. *Id.* at 778. Given Beran and Elzner's extensive interaction with OPG's customers,[30] the Employment Agreements are also enforceable because they are designed to prevent employees from usurping OPG's customer goodwill, which is exactly what Defendants did here.

> **b)**     **Despite Elzner's best efforts, the restrictive covenants in the Employment Agreements remain in full force and effect.**

Elzner's attempted termination of the Employment Agreements warrants no credence from the Court. Application of all potentially applicable laws do not permit corporate officers, such as Elzner, to covertly engage in such self-interested and unauthorized activities.

Under Texas law, corporate officers—such as Elzner—owe certain duties, such as the duty of loyalty. The duty of loyalty "dictates that a corporate officer or director must act in good faith and must not allow his or her personal interest to prevail over the interest of the corporation. The duty of loyalty requires an extreme measure of candor, unselfishness, and good faith on the part of the officer or director."[31] And "interested" transactions are subject to a higher level of scrutiny:

> The duty of loyalty holds officers and directors to an "extreme measure of candor, unselfishness and good faith," particularly where there is an interested transaction. *Intn'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 577 (Tex. 1963). Whether an officer or director is "interested" is a question of fact. *Id.* Interested transactions include those in which officers or directors derive personal profit as well as those which deprive the corporation of an opportunity to profit. *Assurance Systems Corp. v. Jackson (In re Jackson),* 141 B.R. 909, 916 (N.D. Tex. 1992). A transaction between a fiduciary's corporation and another corporation in which the fiduciary has a significant financial interest is also an interested transaction. *Id.* In such a situation, an officer or director must not allow his personal interests to prevail over the interests of the corporations. *Gearhart Industries, Inc. v. Smith Intn'l, Inc.,* 741 F.2d 707, 719-20 (5th Cir. 1984).[32]

A corporate fiduciary must not usurp corporate opportunities for personal gain. And transactions in which a corporate fiduciary derives personal benefit are subject to the closest

---

[30] *See* Decl. ¶¶ 10-12.
[31] *Landon v. S & H Mktg. Grp.,* 82 S.W.3d 666, 672 (Tex. App.—Eastland 2002, no pet.) (citing *Int'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 577 (Tex. 1963)).
[32] *Mims v. Roth (In re Perform. Nutrition, Inc.),* 239 B.R. 93, 110 (N.D. Tex. 1999).

**APPLICATION FOR TEMPORARY RESTRAINING ORDER**                                    **PAGE 9**

examination.[33] Evidence of this type of personal gain renders those transactions voidable.

Similarly, if the Court determines Delaware law applies,[34] Elzner's attempt to terminate the Employment Agreements remains inapplicable under that state's law as well. Like Texas, Delaware also provides that corporate officers and directors owe a duty of loyalty to the corporation they serve.[35] The duty of loyalty "mandates that the best interests of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[36] While transactions between directors, corporate officers, and the corporation are not immediately voidable, they require strict scrutiny as there is a possibility that a director or corporate officer may favor his or her own interests above that of the corporation's. Delaware courts have found a director or corporate officer is interested in a transaction when he or she "is on both sides of a transaction."[37]

When signing the termination letter of his own Employment Agreement, Elzner was on "both sides of the transaction," acting on behalf of both himself and OPG as its President. Delaware applies Section 144 of the Delaware General Corporation Law (the **"DGCL"**) when analyzing interested transactions. Under Section 144, a contract or transaction with an interested director shall *not* be voidable **only if** one of the following exceptions exist: **(1)** the material facts of the director's or officer's relationship or interest are known to the board (or a committee of the board) and the board or committee, in good faith, authorizes the contract or transaction by the affirmative vote of a majority of the disinterested directors; **(2)** the material facts as to the director's or officer's relationship or interest are known to the stockholders and the stockholders, in good faith

---

[33] *Holloway*, 368 S.W.2d at 577.
[34] OPG is a Delaware company organized under the laws of Delaware.
[35] *Guth v. Loft, Inc.*, 23 Del. Ch. 255, 5 A.2d 503 (1939).
[36] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993), decision modified on reargument, 636 A.2d 956 (Del. 1994).
[37] *Cinerama, Inc. v. Technicolor*, Inc., 663 A.2d 1156, 1169, Fed. Sec. L. Rep. (CCH) P 98812 (Del. 1995) (citations omitted).

**APPLICATION FOR TEMPORARY RESTRAINING ORDER**                                    **PAGE 10**

approve the contract or transaction; or **(3)** the contract or transaction is fair as to the corporation as of the time it is authorized by the board, a committee or the board or the stockholders.

None of those exceptions apply. Elzner's termination of his own employment did not receive approval of a majority of the disinterested directors of OPG, a majority of the disinterested members of a committee of the Board of Directors, or stockholder approval, rendering the attempted termination voidable under Delaware law.

Moreover, the general rule in Delaware is that "material" actions by a corporation require approval of the Board. One such commonly understood category is entering into employment agreements with, or amending the terms of employment of, senior officers. Elzner received cash and stock when SCF Partners acquired a majority stake in OPG in 2013, and both received stock options in consideration for the restrictive covenants in the Employment Agreements.[38] The Employment Agreements are not some run-of-the-mill contract that Elzner could unilaterally modify, amend or cancel without Board approval. SCF Partners required them to sign the Employment Agreements in conjunction with the 2013 transaction.[39] No leap in logic is needed to conclude that cancelling contracts that were material to the 2013 transaction would have been a material action requiring full Board approval.[40] Of course, if the action constitutes waste, illegality, fraud, or an *ultra vires* act, not even ratification by disinterested directors or anything less than a unanimous shareholder vote will protect the transaction, or those participating in it.[41] Plus, Elzner's attempted termination violated his fiduciary duties to OPG. Especially since Elzner apparently believed his actions allowed him to form a competing business and solicit OPG's

---

[38] Decl. ¶ 17; *see also supra,* at note 1.
[39] Decl. ¶ 17.
[40] For example, "[a] chief executive officer . . . may not act in a manner contrary to the express desires of the board of directors." *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 775 n.570 Del Ch 2005), *aff'd*, 906 A.2d 27 (Del. 2006).
[41] *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del.), *modified*, 636 A.2d 956 (Del. 1994); *Schreiber v. Bryan*, 396 A.2d 512, 518 (Del. Ch. 1978).

employees and customers—all while using OPG's trade secret and confidential information.[42]

Even if Elzner had obtained full Board approval to terminate the Employment Agreements (he did not), the restrictive covenants would have expressly survived. A simple review of the Employment Agreements confirms they contain a survival clause under which certain provisions of the Employment Agreement, including restrictive covenants and confidentiality provisions, and any provisions necessary to interpret and apply them, survive termination:

> This Section 9.10 and the provisions of Articles V, VI, VII and VIII and those portions of this Agreement necessary to interpret and apply them shall survive any termination of this Agreement and any termination of the employment relationship between Employee and the Company.[43]

The one-year restricted period did not begin on termination of the Employment Agreement. It began on the date Beran and Elzner's employment with OPG ended.[44] Elzner's "termination" letters made clear that their employment with OPG did not terminate by those letters.

### c)      The Employment Agreements contain reasonable restrictions.

The non-compete and non-solicitation restrictions in the Employment Agreements are reasonable as to length, geographical area, and scope—especially considering Beran and Elzner's vital roles with OPG. The Employment Agreements' one-year restriction on working for a competing business and soliciting OPG's employees and customers is a reasonable length, as Texas courts regularly uphold covenants of this length (and longer).[45]

---

[42] Because the action could have a material adverse effect on shareholder value, even if Elzner had board approval, he likely would have needed full approval of the shareholders as well.

[43] Decl. ¶ 18; Ex. A, B § 9.10.

[44] Decl. ¶ 18; Ex. A, B § 1.6 (the "Date of Termination" is the date employment terminates) and § 7.1 (the "Restricted Period" is the later of the second anniversary of the effective date of the contract or the date that is one year after the "Date of Termination").

[45] *See Bay Cities Recovery, Inc. v. Digital Recognition Network, Inc.*, No. 4:18-CV-280-A, 2018 WL 4903233, at *5 (N.D. Tex. Oct. 5, 2018) (upholding a one-year non-compete and noting that Texas "[c]ourts routinely uphold noncompetition agreements of more than one year"); *Redi-Mix Solutions, Ltd. v. Express Chipping, Inc.*, No. 6:16-cv-298-RWS-KNM, 2016 WL 7634050, at *9 (E.D. Tex. Dec. 2, 2016) ("Texas courts have repeatedly held that two years is a reasonable time frame for a noncompete agreement."); *Gallagher Healthcare Ins. Servs. v. Vogelsang*, 312 S.W.3d 640, 655 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Two to five years has repeatedly been held as a reasonable time in a non-competition agreement.")

The geographic scope is reasonable given the nature of the industry and Beran and Elzner's influential roles within OPG. "The breadth of enforcement of territorial restraints in covenants not to compete depends upon the nature and extent of the employer's business and the degree of the employee's involvement."[46] Texas courts routinely "uphold a national or global covenant whose scope exceeds an employee's territory when the scope is justified by the business interest underlying the covenant."[47]  The non-compete and non-solicit restrictions in the Employment Agreements apply only to certain locations where OPG is most profitable and the areas in which its oilfield services are most lucrative.[48] Beran and Elzner's work for OPG had a national impact on OPG's operations, pricing and customer relations, particularly in those states outlined in the Employment Agreements. And given their influence over OPG's business, their leadership roles at OPG, and the breadth of trade secrets and other confidential information they developed and had access to, it is reasonable (and necessary) to enforce the non-compete and non-solicit restrictions, as specified in the Employment Agreements.

The scope of activities restricted are justified by Beran and Elzner's extensive access to all aspects of OPG's business, including trade secrets and other confidential information concerning OPG's customers, business plans and strategies, cost, pricing and margin information, and information shared between OPG and third parties on a confidential basis.[49] The Employment Agreements prohibit them from engaging in any similar "Business." The Employment Agreements define "Business" as including "the provision and sale of the products and services that were provided by [OPG] or any of its Affiliates during the period of time in which Employee[s] [were]

---

[46] *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793 (Tex. App.—Houston [1st Dist.] 2001, no pet.); *see also Providence Title Co. v. Truly Title, Inc.*, 547 F. Supp. 3d 585, 602 (E.D. Tex. 2021) (finding that a non-compete could reasonably cover employer's entire operating territory, given employee's seniority and access to confidential information).
[47] *Accruent, LLC v. Short*, 2018 WL 297614, at *4 (W.D. Tex. Jan. 4, 2018).
[48] Decl. ¶ 18; Ex. A, B, Exhibit A.
[49] Decl. ¶¶ 7-8.

**APPLICATION FOR TEMPORARY RESTRAINING ORDER**                                    **PAGE 13**

employed by [OPG] or its Affiliates or permitted assigns, excluding the provision of and sale of products and services as part of any business, product or service line, or division in which Employee[s] [were] not directly involved as a manager or supervisor during such employment."[50]

"Business" is further defined as including, without limitation, "the provision of rental services related to short and long-term living quarters supporting oil and gas drilling and production operations, drill pipe rental and related drilling tool and accessory rental services, water and sewer services supporting delivery and removal of potable and non-potable water for oil and gas rigs and living quarters, and providing equipment and personnel to manage initial flowback and testing of oil and gas wells."[51] The scope of the non-compete and non-solicit provisions are sufficiently tailored in scope by only precluding Beran and Elzner's potential employment with companies that provided the same or similar services as those provided by OPG.

Even if the Court finds the scope of Beran and Elzner's non-compete and non-solicit restrictions are unduly broad as currently written, the Court should reform the Employment Agreements as required by the Act to prohibit Defendants from providing any services to a competitor—*i.e.*, Titan—that are the same or similar to those they provided to OPG.[52]

> **d)    The Employment Agreements are narrowly tailored to protect OPG's confidential information and business goodwill.**

"Interest[s] worthy of protection" include, *inter alia*, business goodwill, confidential or proprietary information, trade secrets, and customer information.[53]  Applying the non-compete

---

[50] Decl. ¶ 18; Exs. A, B § 7.1.
[51] Decl. ¶ 18; Exs. A, B § 7.1.
[52] *See McKissock, LLC v. Martin*, 267 F.Supp.3d 841, 855–56 (W.D. Tex. 2016) (entering a preliminary injunction after reforming noncompete provision), citing Tex. Bus. & Com. Code § 15.51(c) ("If the covenant is found to be ancillary to or part of an otherwise enforceable agreement but contains limitations as to . . . scope of activity to be restrained that are not reasonable . . . *the court shall reform the covenant to the extent necessary to cause the limitations contained [therein] . . . to be reasonable . . . .*").
[53] *Marsh*, 354 S.W.3d at 777-78 ("The Act recognizes [employer]'s goodwill as an interest worthy of protection" including "[t]he advantage acquired through the employee's long-term

and non-solicit covenants in the Employment Agreements to prevent Beran and Elzner from performing any work for Titan that is similar to the work they were performing for OPG would impose a restraint that is no greater than necessary to protect the legitimate business interests of OPG, which include, protecting its customer goodwill as well as its trade secrets and other confidential information concerning OPG's business strategies, cost and pricing information, and information shared between OPG and third-parties on a confidential basis.[54]

### 2.    Elzner and Beran breached the valid restrictive covenants.

Beran and Elzner committed multiple breaches of their Employment Agreements. They started a competing business.  They engaged in competitive employment with Titan. They solicited OPG's employees to leave OPG with them to go work for Titan.  They solicited OPG's customers to divert business from OPG to Titan.   They disclosed and are using OPG's Confidential Information. And they started and are competing through Titan, a company with its principal place of business in Milam County, Texas, in the backyard of OPG, which has its principal place of business in Harris County, Texas. They are not merely trying to compete within the contractually restricted geographic area, Titan is competing *on* OPG's former rig sites, as they have already diverted OPG's customer's rig sites to Titan.[55]

Beyond the evidence of Defendants diverting OPG customer business, the Titan expense reports also show Titan is purchasing housing and other oilfield supplies, which confirms they are directly competitive with OPG.[56] That includes, but is not limited to, pipe fittings, mats, televisions, freezers, command centers, tools, yard generators, rig phones, and fuel.[57] One of the

---

relationship and contact with customers. . . ."); *Alex Sheshunoff Mgmt. Servs.*, 209 S.W.3d at 649 ("business goodwill and confidential or proprietary information are examples of such worthy interests") (citations omitted).
[54] *See* Decl. ¶¶ 7-8, 36-37.
[55] Decl. ¶¶ 26-28.
[56] *See* Decl. ¶ 26.
[57] *See* Decl. ¶ 26.

notations in the Titan expense report even references one of OPG's largest customers that was stolen by Titan.[58] One of the abbreviations on the Titan expense report also matches an OPG abbreviation for one of the OPG customer rigs that OPG lost to Titan.[59]  OPG has already lost three of its customers' rig sites to Titan through Beran and Elzner's competition in breach of their Employment Agreements. Titan has set up housing and water systems—the same services OPG provides its customers—on OPG customers' rig sites, corroborated by photographic evidence.[60] OPG expects to imminently lose two more of its customers' rig sites to Titan.[61]  These breaches have caused and will continue causing OPG substantial harm as explained in its Complaint.

**C.**    **OPG will succeed on the merits of its Defend Trade Secrets Act and Texas Uniform Trade Secrets Act claims.**

To establish a violation of the Defend Trade Secrets Act (**"DTSA"**) OPG must show: **(1)** a trade secret existed; **(2)** misappropriation; and **(3)** use in interstate commerce.[62] To establish a violation of the Texas Uniform Trade Secrets Act (**"TUTSA"**) OPG must show: **(1)** a trade secret existed, **(2)** the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and **(3)** use of the trade secret without OPG's authorization.[63]

Misappropriation for both the DTSA and TUTSA includes **(1)** "disclosure or use of a trade secret of another without . . . consent by a person who . . . used improper means to acquire knowledge of the trade secret" and **(2)** "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."[64] "Improper means" include the "breach or inducement of a breach of a duty to maintain secrecy."[65]

---

[58] *See* Decl. ¶ 26.
[59] Decl. ¶ 27.
[60] Decl. ¶¶ 25-28; Ex. K.
[61] Decl. ¶ 25.
[62] 18 U.S.C. § 1836
[63] TEX. CIV. PRAC. & REM. CODE § 134A; *Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 586, 600 (5th Cir. 2015).
[64] TEX. CIV. PRAC. & REM. CODE § 134A.002(3); 18 U.S.C. § 1839(5).
[65] TEX. CIV. PRAC. & REM. CODE § 134A.002(2); 18 U.S.C. § 1839(6)(A).

At the TRO stage, a court does not determine if the information at issue is a trade secret; it instead determines if "the applicant has established that the information is entitled to trade-secret protection until the trial on the merits."[66] Texas courts widely agree that at the TRO stage the applicant can show misappropriation merely by demonstrating the former employee's new job will inevitably lead him to rely on the plaintiff's trade secrets.[67]

Here, Beran and Elzner had access to, retained, and impermissibly disclosed OPG's trade secret information. We have more than just a threat they will improperly maintain and use OPG's trade secrets. Defendants have already used OPG's trade secret information, as indicated by Titan's use of OPG's expense report for the benefit of Titan. Even more concerning, OPG uncovered evidence that Beran, Elzner and other departing OPG employees deleted a large amount of emails from OPG's systems just before their coordinated departures.[68] It is likely that, in addition to OPG expense reports, Defendants have misappropriated more of OPG's trade secrets, as Employee Defendants' deletion conduct indicates they tried to cover their tracks when leaving OPG.

Defendants have utilized deceptive tactics to poach OPG's customers—as indicated through the loss of two of its most valued customers. Defendants have used, and will inevitably continue to use, OPG's trade secrets to poach its customers and neutralize its competitive plans.

Defendants possess extensive and intimate knowledge about OPG's business and business strategy, financial goals, marketing strategies, customer lists, prospect lists, customer pricing, supply chain information, and communications concerning OPG's business strengths and weaknesses. Armed with this proprietary information, Defendants will inevitably use these trade secrets they obtained from OPG for the benefit of Titan and the detriment of OPG.

---

[66] *First Command Fin. Planning, Inc. v. Velez*, No. 4:16-CV-01008-O, 2017 WL 2999405, at *6 (N.D. Tex. May 8, 2017).

[67] *See FMC Corp. v. Varco International, Inc.*, 677 F.2d 500, 504 (5th Cir. 1982); *Keurig Dr Pepper Inc. v. Chenier*, No. 4:19-CV-505, 2019 WL 3958154, at *7 (E.D. Tex. Aug. 22, 2019).

[68] Decl. ¶ 24.

D.    **OPG has suffered and will continue to suffer irreparable harm if Defendants' wrongful and unlawful conduct is not enjoined.**

Irreparable harm is generally "defined as one which 'cannot be undone through monetary remedies.'"[69] "[P]roof that a highly trained employee is continuing to breach a non-competition covenant gives rise to a rebuttable presumption that the applicant is suffering irreparable injury."[70] The "injury resulting from the breach of non-compete is the epitome of irreparable injury, so enforcement appears to be the rule rather than the exception."[71]

Due to the senior positions Beran and Elzner had at OPG, their access to all aspects of OPG's inner workings, and their exposure to other trade secrets and confidential information, they are uniquely positioned to inflict immediate and irreparable harm on OPG through their work for Titan.[72] Given their extensive knowledge of OPG's trade secrets and confidential information, and their new positions at Titan, Beran and Elzner's use and disclosure of such information would be unavoidable and inevitable in the course of their work for Titan.[73]  As a consequence, Beran and Elzner's roles at Titan threaten to immediately and irreparably harm OPG.[74]

---

[69] *G&G Closed Circuit Events, LLC v. 1) GCF enterprises LLC*, EP-15-CV-00111-KC, 2015 WL 7313427, at *5 (W.D. Tex. Nov. 9, 2015), quoting *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981).

[70] *Electro-Motor, Inc. v. Indus. Apparatus Servs., Inc*., 390 B.R. 859, 870 (Bankr. E.D. Tex. 2008) (quoting *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 236 (Tex. App.—Houston [1st Dist.] 2003, no. pet.).

[71] *See Sirius Computer Sols., Inc. v. Sparks*, 138 F. Supp. 3d 821, 841 (W.D. Tex. Oct. 5, 2015) (finding plaintiff faced substantial threat of irreparable injury when former employee's noncompete violations threatened to cost "potential lost goodwill," and "potentially lost confidential and proprietary information.") (internal citations omitted).

[72] Decl. ¶¶ 36-39.

[73] Decl. ¶¶ 36-39.

[74] *See McKissock, LLC*, 267 F. Supp. at 859 (finding movant demonstrated irreparable injury where former employee received confidential information and sought to continue working for a competitor, as the employee "would likely have difficulty not utilizing the confidential information she acquired while at [former employer] during the course of her employment for a competitor . . ."); *Daily Instruments Corp. v. Heidt*, 998 F.Supp.2d 553, 569 (S.D. Tex. 2014) ("An employee who possesses trade secrets belonging to a former employer and accepts employment with one of its competitors, even if acting in good faith, will have difficulty preventing his knowledge from infiltrating his work."); *TransPerfect Translations, Inc. v. Leslie*, 594 F.Supp.2d 742, 757 (S.D. Tex. 2009) ("[W]here [an] employer [shows] it will be difficult for [an] employee to compartmentalize his knowledge, it is likely that employee's knowledge gained at the former employer will allow him an unfair advantage in making strategic decisions at his new employer.").

The harm to OPG has already been realized. OPG has lost valued customers and employees. OPG has lost the benefit of preserving its trade secret and confidential information, as indicated through Titan's use of OPG's trade secret information, including the expense report that Titan "retooled" as its own.  Further, given Defendants' client-facing role at OPG, and their extensive interaction with OPG's customers, Defendants are unfairly capitalizing on OPG's goodwill for Titan's benefit, thereby irreparably harming OPG's customer goodwill.

And lest we forget: Defendants contractually acknowledged and agreed that a breach of their non-compete and non-solicit covenants would subject OPG to irreparable harm and justify injunctive relief against them,[75] which further substantiates the irreparable harms.[76] It cannot be disputed OPG has suffered and will continue suffering irreparable harm from Employee Defendants' brazen breach of their Employment Agreements and misappropriation.

**E.    The balance of the equities favors OPG.**

As a result of Employee Defendants' breach of their Agreements with OPG and Defendants' use of OPG's trade secret information, OPG faces immediate and irreparable harm to its business operations and competitiveness in the market, substantial loss of customer goodwill, and loss of competitive use and value of OPG's confidential information and trade secrets.

The benefit of injunctive relief to OPG far outweighs any detriment to Defendants because, where injunctive relief would merely require former employees to obey their existing contractual obligations, the balance of the hardships favors the former employer.[77] Where, as here, the absence

---

[75] Decl. ¶ 18; Exs. A, B § 7.5.

[76] *See Brink's Inc. v. Patrick*, 2014 WL 2931824, at *7 (N.D. Tex. 2014) (entering preliminary injunction on noncompete violation, reasoning that the harm was irreparable, in part, since "the parties themselves apparently recognized the serious harm that the breach of the non-compete agreement could cause, because [defendant] expressly agreed in his Confidentiality and Non–Competition Agreement that [plaintiff] would have the right to a preliminary injunction in order to enforce the non-competition provisions.").

[77] *See Direct Biologics, LLC v. McQueen*, No. 1:22-CV-381-SH, 2022 WL 1409984, at *13 (W.D. Tex. May 4, 2022) (noting the burden imposed by a TRO on the former employee is no greater than terms of a reasonable contract to which he voluntarily agreed).

of injunctive relief risks jeopardizing an employer's competitive benefits obtained through enforcement of its restrictive covenants and protection of its trade secrets is contrasted with the slight risk of harm of imposing reasonable restrictions upon a defendant, then the balance of equities favors issuing an injunction.[78] OPG stands to lose more goodwill and years of efforts and expenses incurred to create its trade secret information due to Defendants' violation of their restrictive covenants, including their non-competition and non-solicitation agreements.

**F.    The public interest supports injunctive relief.**

The requested TRO serves the public interest because injunctive relief would protect OPG's valuable trade secrets and goodwill.  Further, entry of a TRO is justified because it is in the public's interest "to uphold contracts and to enforce a remedy that is provided for by Texas law" and because "[t]he public interest is served by enforcing the parties' non-compete agreement to preserve the public trust in the enforceability of contracts."[79]

## IV.    CONCLUSION

Based on the foregoing, OPG requests the Court enter a temporary restraining order as detailed in its proposed order, filed herewith. If required, OPG is willing and able to post reasonable bond as ordered by the Court, in support of any injunctive order issued by the Court.

---

[78] *See Providence Title*, 547 F. Supp. 3d at 606, *reconsideration denied,* No. 4:21-CV-147-SDJ, 2021 WL 5003273 (E.D. Tex. Oct. 28, 2021), *aff'd sub nom, Providence Title Co. v. Fleming*, No. 21-40578, 2023 WL 316138 (5th Cir. Jan. 19, 2023) (finding reasonable restrictions in non-compete clause of a shareholder agreement mitigated any harm enjoining the former employee from working at a direct competitor would pose; the harm was further mitigated where the agreement was supported by the adequate consideration (company stock) she received).
[79] *Avenue7Media, LLC v. Johnson Greer*, SA-22-CV-00817-JKP, 2022 WL 17365278, at *3 (W.D. Tex. Dec. 1, 2022), quoting *McKissock, LLC*, 267 F. Supp. 3d at 860.

Date: June 20, 2023                    Respectfully submitted,

                                       **HAYNES BOONE LLP**

                                       By: */s/ Michael J. Lombardino*

                                       Michael J. Lombardino
                                       Texas State Bar No. 24070159
                                       Michael.Lombardino@haynesboone.com
                                       1221 McKinney Street, Suite 4000
                                       Houston, Texas 77010
                                       Telephone: 713.547.2301
                                       Facsimile: 713.547.2600

                                       Laura E. O'Donnell
                                       Texas State Bar No. 00797477
                                       Laura.ODonnell@haynesboone.com
                                       Henson Adams
                                       Texas State Bar No. 24101418
                                       Henson.Adams@haynesboone.com
                                       112 East Pecan Street, Suite 1200
                                       San Antonio, Texas 78205
                                       Telephone: 210.978.7414
                                       Facsimile: 210.554.0457

                                       **COUNSEL FOR OIL PATCH GROUP, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of June 2023, a true and correct copy of the foregoing document was tendered for filing to the Clerk of the U.S. District Court for the Southern District of Texas using the Court's CM/ECF system.

                                       */s/ Michael J. Lombardino*
                                       Michael J. Lombardino

## <u>CERTIFICATE REGARDING NOTICE</u>

I hereby certify that I provided notice of OPG's notice of intent to file the foregoing document along with a copy of OPG's Original Complaint to Defendants' Counsel on this 20th day of June 2023, and will provide a true and correct copy of the foregoing document to Defendants' Counsel on the following business day, to the following email addresses and physical addresses by FedEx:

Baili B. Rhodes
West Webb Allbritton & Gentry
baili.rhodes@westwebb.law
1515 Emerald Plaza
College Station, Texas 77845

*/s/ Michael J. Lombardino*
Michael J. Lombardino

4867-1842-4169

**APPLICATION FOR TEMPORARY RESTRAINING ORDER**                                    **PAGE 22**